[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 6, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-12017

_____

D.C. Docket No. 00-00900-CV-J-21-TJC

JIM E. CHANDLER, individually
and on behalf of a class of all others
similarly situated,
WILLIAM KELLEY, individually
and on behalf of a class of all others
similarly situated,

Plaintiffs-Appellants,

versus

JAMES CROSBY, in his official
capacity as Secretary, Florida
Department of Corrections,
BRADLEY D. CARTER, in his
official capacity as Warden of
Union Correctional Institution,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(August 6, 2004)**

Before TJOFLAT, BARKETT and SILER[*], Circuit Judges.

TJOFLAT, Circuit Judge.

## I.

## A.

The plaintiffs are death row inmates residing on the Northeast Unit (the "Unit") of Union Correctional Institution ("UCI") in Raiford, Florida. Their complaint—filed in August 2000—alleges that the high temperatures in their cells during the summer months amount to "cruel and unusual punishment" under the Eighth Amendment to the United States Constitution. They seek declaratory and injunctive relief under 42 U.S.C. § 1983.[1] The defendants Secretary and Warden (the "prison officials") deny that the inmates' cell temperatures constitute cruel

---

[*]Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

[1]Section 1983 states:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

and unusual punishment.

Soon after filing their complaint, the plaintiffs presented the district court with an unopposed motion for class certification. On December 4, 2000, the court, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure,[2] certified a class consisting of "all persons who are currently assigned to the Northeast Unit at Union Correctional Institution or who in the future will be assigned to that housing unit." After the parties concluded their discovery and the district court viewed the Unit,[3] the court convened a bench trial. On March 24, 2003, the court issued an order denying relief on the merits.[4] The inmates now appeal.

_____

[2]Rule 23 states:

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

. . .

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . .

[3]The court did not describe its observations on the record.

[4]At the close of the plaintiffs' evidence, the defendants moved for judgment as a matter of law. The court reserved ruling on this motion but eventually denied it on January 14, 2003.

B.

The Unit is home to some three hundred death row prisoners. It is a concrete structure consisting of six wings.[5] Each wing has two floors, and each floor has twenty-eight cells, which are arranged into two back-to-back rows of fourteen. Each cell front faces an outside wall of the Unit. There are two windows on the walls across from each cell. They open with handcranks.

Between the cell fronts and the prison wall is a bifurcated walkway. The outer walkway, or "secure catwalk," is immediately adjacent to the exterior wall. The inner walkway is immediately adjacent to the cell fronts. Bars separate the outer and inner walkways. The walkways together are between eight and ten feet wide.

The cells are arranged back to back. Between the backs of the cells is the "chase," which is, in the district court's words, "a long corridor" "that contains plumbing, duct work and electrical services for the cells." The chase accommodates the two systems that are relevant to our analysis: the winter heating system and the summer ventilation system.

The winter heating system works though supply and return vents located on

---

[5]The wings protrude from a central core familiarly known as the "quarterdecks," where the guards' offices are located. The quarterdecks are air conditioned but are separated from the wings by weatherstripped steel doors.

the back wall of each cell, about seven feet above the floor. Air enters the return vents and moves through the chase to a furnace in the attic. The warmed air travels back through the chase and enters the cells through the supply vents.

The summer ventilation system consists of exhaust vents located on the back wall of each cell, about four feet above the floor.[6] Air enters the prison through the windows and passes over the walkways into the cells. The air then travels through the vents in the cells and into the chase before being exhausted through fans on the roof.

At present, the summer ventilation system is the only mechanism the prison employs to provide relief from the summer heat. The Unit has neither circulating fans nor air conditioning,[7] and the exhaust vents are not designed to cool the air. In summers past, prison officials sought to provide further relief by running the "air handlers," i.e., the heating system without the furnace. This circulated more air into the cells, and the inmates deflected this air onto themselves by attaching various items (most frequently, the cardboard backings of legal pads) to the heater vents in the cells.[8] For security reasons, prison officials now forbid the use of

---

[6]The exhaust vents measure eighteen inches by eighteen inches.

[7]Nor are the inmates allowed to have personal fans in their cells.

[8]The air handlers did not cool the cells; quite the opposite. Even without the furnace, the air handlers raised the temperature of the air by a few degrees. The prisoners requested that the

these makeshift "air deflectors." Furthermore, at the recommendation of the prison engineers, the guards no longer activate the air handlers during the summer.

Each prisoner is confined to his own individual cell.[9] Generally speaking, the inmates may only leave their cells for the following reasons: (1) outdoor recreation, twice per week, for two hours each time; (2) showers, three times per week; (3) attorney and media visits; (4) personal visits; (5) use of the prison library; and (6) medical and mental health appointments. The visiting areas, prison library, and medical and mental health offices are air conditioned.[10]

## C.

According to the district court's dispositive order, the Unit cools itself by cyclically exchanging air with the outside environment. First, in the evening and

---

guards turn on the air handlers because the increased air circulation (especially when concentrated through an air deflector) made them <u>feel</u> cooler. Fred Dougherty, the prison engineer, testified that the ventilation system, without the air handlers, should be employed in the summer months for maximum efficiency. The district court credited Dougherty's testimony over that of the inmates' mechanical engineering expert, Edward Eng.

[9]The district court did not make a specific finding as to the size of the individual cells, although the prison officials admitted in their answer that each cell is "6 x 9 x 9.5 feet high."

[10]The district court did not specifically find that these areas are air conditioned, but the testimony supports this fact. Plaintiff Kelley testified that the visiting area is air conditioned; plaintiff Chandler testified that the library is air conditioned; Lisa Wiley, a psychological specialist at the Unit who testified on behalf of the inmates, said that her office is air conditioned; and inmate Edward Ragsdale testified that the medical clinic is air conditioned.

The prison officials admitted in their answer to the plaintiffs' complaint that the inmates "may leave their cells for visits one day per week, either Saturday or Sunday, during the hours of 9 am to 3 pm."

Chandler testified that he goes to the air-conditioned library for one hour every week.

6

throughout the night, "the outdoor temperature falls below the building mass temperature." As a result, "the air flowing through the building pulls heat out of the building mass, and continues to pull out the heat generated" within the building. Second, "[a]fter the sun rises . . . the outside air temperature [becomes] higher than the building temperature and warm air is pulled into a relatively cool building." The building thus becomes warmer as the day progresses. Third, "as the outdoor temperature becomes higher and higher, the difference between the outdoor temperature and the indoor temperature becomes greater, with the indoor temperature falling below the outdoor temperature." Finally, "[a]s the sun goes down, the outside air temperature falls below the temperature of the building, and the cycle begins again." The district court found that the "Unit has a very slow thermal response compared with the outdoor air because it is a concrete building. . . . Thus, the building mass remains at a relatively constant temperature, between approximately eighty degrees at night [and] approximately eighty-five or eighty-six degrees during the day."

Extensive cell temperature data supports the district court's findings. In July and August 1998 and July 1999, prison officials kept logs of the temperatures

on all floors of the Unit.[11]  Fred Dougherty, the head engineer for the Florida

prison system, commissioned a statistical analysis of the data.  The statistician,

Max Linn, analyzed the temperatures recorded at 2 p.m. and 6 p.m. each day.[12]

From this study, the district court determined the following:[13] (1) "during eleven

percent of the month of July, 1998, some inmates housed on the . . . Unit may have

been subjected to temperatures greater than ninety degrees"; (2) "only fifteen

percent of the temperature readings recorded for the month [of August 1998] were

over ninety degrees"; (3) "only one percent of the temperature readings recorded

for the month [of July 1999] were over ninety degrees"; (4) "[o]n average, inmates

on the . . . Unit may have experienced temperatures over ninety degrees nine

percent of the time during the months of July and August 1998 and July of 1999";

(5) "[i]n all of [the July and August 1998 and July 1999] readings, the temperature

was recorded at ninety-five degrees or higher on only seven occasions"; (6)

---

[11]Prison officials also kept logs of the Unit's temperatures in August 1999.  The district court rejected the August 1999 data in reliance on testimony from Fred Dougherty, the prison engineer.  Dougherty determined that the instruments used to measure the temperatures in August 1999 must have been flawed, since the prison temperatures were inordinately higher than the outdoor temperatures in nearby Gainesville.  The inmates do not presently challenge the district court's decision to reject the August 1999 temperature readings.

[12]The district court stated: "These two time periods were chosen for the analysis because those were the times when one would expect the highest temperatures to occur. . . . A review of the temperature logs confirms that this assumption is true."

[13]Each of these determinations is based upon the statistical analysis, which only considered the 2 p.m. and 6 p.m. temperature readings.

"[d]uring the summer months of July and August 1998 and July of 1999, at the hours of 2:00 p.m. and 6:00 p.m., there were no readings taken by DOC staff that exceeded 100 degrees."

The court also made findings regarding the Unit's humidity and air circulation. As to the former, the court stated: "When the ventilation system is running per design, the relative humidity in the building rarely rises above seventy percent, the humidity level needed to support the growth of mold and mildew[, and] heat, odors and contaminants are exhausted out of the building." As to the latter, the court found that the ventilation system, when working properly, circulated air as well or better than other "[t]ypical[] comfort ventilation systems."[14] Crucially, the court determined that "the system was operating within the range of design parameters."[15]

Based upon the statistical data and the testimony elicited from both parties, the court ultimately concluded:

---

[14]The court found that while "comfort ventilation systems are [usually] designed to provide thirty to forty air exchanges per hour[,] [t]he . . . Unit is designed to provide for almost sixty air changes per hour." An "air exchange," according to the court's order, "is the amount of time it takes to completely change the air in a given space."

[15]Specifically, the district court found that the system "was operating within the range of design parameters" on August 29, 2000, the day that the inmates' mechanical engineering expert, Edward Eng, took measurements at the Unit. Although the district court did not explicitly say that the system always operates within design parameters, we believe that the court meant implicitly to say so. Nothing in the district court's dispositive order indicates that the court found that the system has failed to work per design.

9

According to accepted engineering standards for institutional residential settings, the temperatures and ventilation on the . . . Unit during the summer months are almost always consistent with reasonable levels of comfort and slight discomfort which are to be expected in a residential setting in Florida in a building that is not air-conditioned.

## II.

Before considering the merits of this case, we must address a threshold matter. According to 42 U.S.C. § 1997e(a), enacted as part of the Prison Litigation Reform Act (the "PLRA"),

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

The PLRA's effective date was April 26, 1996; because the prisoners filed their complaint after this date, the PLRA applies. Higginbottom v. Carter, 223 F.3d 1259, 1260 (11th Cir. 2000). A district court must dismiss the suit when it finds that the plaintiff-inmate has not exhausted his administrative remedies. Cf. Brown v. Sikes, 212 F.3d 1205, 1207 (11th Cir. 2000) ("We review de novo the district court's dismissal of suit for failure to exhaust available administrative remedies under § 1997e(a) of the PLRA.").[16] It appears that the district court in this case

---

[16]Although we have noted that "[m]ost courts addressing this issue have decided that § 1997e(a) is not a jurisdictional mandate," Brown, 212 F.3d at 1207 n.2, we have not decided this question directly. Thus, we have not determined whether the district court should dismiss

10

neglected to determine whether the inmates satisfied the PLRA's requirements.[17]

We now find that they did.

We begin by deciding how the inmates, as a class, may exhaust their administrative remedies for PLRA purposes. We hold that a class of prisoner-plaintiffs certified under Rule 23(b)(2) satisfies the PLRA's administrative exhaustion requirement through "vicarious exhaustion," i.e., when "one or more class members ha[s] exhausted his administrative remedies with respect to each claim raised by the class." Jones 'El v. Berge, 172 F. Supp. 2d 1128, 1133 (W.D. Wis. 2001); see Hattie v. Hallock, 8 F. Supp. 2d 685, 689 (N.D. Ohio 1997) (noting that the "doctrine [of vicarious exhaustion] is only available to plaintiffs in

---

pursuant to Federal Rule of Civil Procedure 12(b)(1) (for lack of subject matter jurisdiction) or 12(b)(6) (for failure to state a claim for which relief can be granted). Id. We need not decide this question today.

[17]Below, in their proposed findings of fact and conclusions of law (and their revised version of the same), the inmates stated conclusorily that they had exhausted their administrative remedies. The inmates also said that the prison officials had admitted in their answer that the inmates had exhausted their administrative remedies. This was inaccurate. The complaint described how some of the inmates had pursued grievance procedures regarding the heat. The answer admitted that Chandler and Kelley "filed grievances regarding heat," and admitted the contents of the specific grievances and responses as stated in the complaint. This does not mean that the prison officials admitted that the inmates exhausted their administrative remedies for PLRA purposes.

The record does not indicate whether the district court answered explicitly the question of whether the inmates satisfied the PLRA. The parties have not addressed the PLRA issue in their briefs on appeal. Both sides describe the inmates' grievances, but only as the grievances relate to the subjective component of the Eighth Amendment. See infra Part III.A.

11

a class-action lawsuit, where a class is certified pursuant to Fed. R. Civ. P. 23(b)(2).").  We do so for two reasons.  First, this rule advances the purpose of administrative exhaustion, which, we have stated (albeit in the employment context), "is to put the [administrative authority] on notice of all issues in contention and to allow the [authority] an opportunity to investigate those issues." Griffin v. Carlin, 755 F.2d 1516, 1531 (11th Cir. 1985).  Once the "prison officials have received a single complaint addressing each claim in a class action, they have the opportunity to resolve disputes internally and to limit judicial intervention in the management of prisons."  Jones 'El, 172 F. Supp. 2d at 1133.  Second, a different rule, e.g., one requiring all class members to exhaust their administrative remedies, "could impose an intolerable burden upon the inmate complaint review system." Id. at 1131-32.  This is true both for the inmates and the prison officials. In this case, the Florida Department of Corrections would have been taxed with the duty to respond to complaints from over three hundred death row inmates. Moreover, in cases like this one, where the composition of the class is subject to constant change beyond the class members' control, it could be extraordinarily difficult for all class members to exhaust administrative remedies before filing suit.  See id. at 1131 ("[T]he transfer of just one additional inmate to the institution intermittently would prevent a class action suit from ever being filed . . . .").  Our

rule mirrors the one we adopted for employment discrimination claims brought through Rule 23(b)(2) classes under Title VII of the Civil Rights Act of 1964. See Oatis v. Crown Zellerbach Corp., 398 F.2d 496, 499 (5th Cir. 1968) ("[T]o require a multiplicity of separate, identical charges before the EEOC, filed against the same employer, as a prerequisite to relief through resort to the court would tend to frustrate our system of justice and order.").[18]

We now apply our rule to this case. The Florida legislature has delegated to the Department of Corrections (the "DOC") the duty to establish inmate grievance procedures. See Fla. Stat. Ann. § 944.09(1)(d) ("The department has authority to adopt rules . . . to implement its statutory authority. The rules must include rules relating to . . . [g]rievance procedures which shall conform to 42 U.S.C. s. 1997e."); id. § 944.331 ("The department shall establish by rule an inmate grievance procedure that must conform to the Minimum Standards for Inmate Grievance Procedures as promulgated by the United States Department of Justice pursuant to 42 U.S.C. s. 1997e. The department's office of general counsel shall oversee the grievance procedures established by the department."). The DOC has established such grievance procedures. See Fla. Admin. Code Ann. §§ 33-103.001

---

[18]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

to -103.019. Subject to certain exceptions not applicable in this case, an inmate who wishes to complain about a condition of confinement must first file an "informal grievance . . . to the staff member who is responsible in the particular area of the problem." Id. § 33-103.005(1). If the inmate is unsatisfied with the response he receives, he may file a formal grievance with the warden's office. Id. § 33-103.006(1)(a). If the inmate wants to pursue his complaint further, he may submit an appeal to the Secretary of the DOC. Id. § 33-103.007. The regulations state,

> The Office of the Secretary has designated the Bureau of Inmate Grievance Appeals to receive, review, investigate, evaluate and respond to appeals filed with the Office of the Secretary. Appeals to the Office of the Secretary shall be turned over that same date to the Bureau of Inmate Grievance Appeals . . . .

Id. § 33-103.007(4).

The record shows, and the district court found, that Chandler filed an informal grievance with the assistant warden on August 29, 1999, in which he complained about the excessive heat and inadequate ventilation. The responding official recognized the problem, but stated that the "grievance [was] returned [as] beyond the control of this office." Chandler then filed a formal grievance with the warden on September 12, 1999. The warden responded in the same way as the assistant warden; he also recognized the problem but denied the grievance. Thus,

14

on September 24, 1999, Chandler submitted an appeal to the Secretary of the DOC, which was transferred to the Bureau of Inmate Grievance Appeals. The responding official denied the appeal, stating that "[t]he response [Chandler] received at the institutional level" was "appropriate[]."

It therefore appears that Chandler, a class member, exhausted his administrative remedies as required by Florida law. In light of the rule we adopt today, Chandler's administrative exhaustion satisfies the PLRA's exhaustion requirement as to the entire plaintiff class in this case.[19] We now proceed to consider the inmates' appeal on the merits.

### III.

"We review de novo . . . the district court's resolution of questions of law and of mixed questions of law and fact." Mincey v. Head, 206 F.3d 1106, 1131 (11th Cir. 2000). On the other hand, we may not set aside the district court's factfindings unless they are "clearly erroneous," and we owe "due regard . . . to the opportunity of the [district] court to judge of the credibility of the witnesses." Fed. R. Civ. P. 52(a).

### A.

The Eighth Amendment to the United States Constitution states: "Excessive

---

[19]Other inmates also filed grievances, but we need not discuss them.

bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."[20] The "cruel and unusual punishments" standard applies to the conditions of a prisoner's confinement. Rhodes v. Chapman, 452 U.S. 337, 345-46, 101 S. Ct. 2392, 2398-99, 69 L. Ed. 2d 59 (1981). While "the primary concern of the drafters was to proscribe tortures and other barbarous methods of punishment," the Supreme Court's "more recent cases [show that] [t]he [Eighth] Amendment embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976) (marks, citations, and brackets omitted). "No static test can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Rhodes, 452 U.S. at 346, 101 S. Ct. at 2399 (marks and citation omitted).

Even so, "the Constitution does not mandate comfortable prisons." Id. at 349, 101 S. Ct. at 2400. If prison conditions are merely "restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Id. at 347, 101 S. Ct. at 2399. Generally speaking, prison

---

[20]The Eighth Amendment applies to the states through the Fourteenth Amendment. Rhodes v. Chapman, 452 U.S. 337, 344-45, 101 S. Ct. 2392, 2398, 69 L. Ed. 2d 59 (1981).

16

conditions rise to the level of an Eighth Amendment violation only when they "involve the wanton and unnecessary infliction of pain." Id.

The Supreme Court has developed a two-part analysis to govern Eighth Amendment challenges to conditions of confinement. First, under the "objective component," a prisoner must prove that the condition he complains of is sufficiently serious to violate the Eighth Amendment. Hudson v. McMillian, 503 U.S. 1, 8, 112 S. Ct. 995, 999, 117 L. Ed. 2d 156 (1992). The challenged condition must be "extreme." Id. at 9, 112 S. Ct. at 1000. While an inmate "need not await a tragic event" before seeking relief, Helling v. McKinney, 509 U.S. 25, 33, 113 S. Ct. 2475, 2481, 125 L. Ed. 2d 22 (1993), he must at the very least show that a condition of his confinement "pose[s] an unreasonable risk of serious damage to his future health" or safety, id. at 35, 113 S. Ct. at 2481. Moreover,

> the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the challenged condition of confinement]. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

Id. at 36, 113 S. Ct. at 2482. The Eighth Amendment thus guarantees that prisoners will not be "deprive[d] . . . of the minimal civilized measure of life's

necessities." Rhodes, 452 U.S. at 347, 101 S. Ct. at 2399.

Second, the prisoner must show that the defendant prison officials "acted with a sufficiently culpable state of mind" with regard to the condition at issue. Hudson, 503 U.S. at 8, 112 S. Ct. at 999 (marks and citation omitted). The proper standard is that of deliberate indifference. Wilson v. Seiter, 501 U.S. 294, 303, 111 S. Ct. 2321, 2327, 115 L. Ed. 2d 271 (1991). Negligence does not suffice to satisfy this standard, id. at 305, 111 S. Ct. at 2328, but a prisoner need not show that the prison official acted with "the very purpose of causing harm or with knowledge that harm [would] result," Farmer v. Brennan, 511 U.S. 825, 835, 114 S. Ct. 1970, 1978, 128 L. Ed. 2d 811 (1994). In defining the deliberate indifference standard, the Farmer Court stated:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Id. at 837, 114 S. Ct. at 1979. Furthermore, the official may escape liability for known risks "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844, 114 S. Ct. at 1982-83.[21]

_____

[21]Consistent with the standards the Supreme Court has established, we have stated that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious

18

As judges, we lack "carte blanche to impose [our own] theories of penology on the nation's prisons." Bass v. Perrin, 170 F.3d 1312, 1316 (11th Cir. 1999); see Rhodes, 452 U.S. at 346, 101 S. Ct. at 2399 ("Eighth Amendment judgments should neither be nor appear to be merely the subjective views of judges." (marks and citation omitted)). Our analysis "should be informed by objective factors to the maximum possible extent." Id.

## B.

To guide us in our decision, we look to some of the cases in which federal courts have considered Eighth Amendment claims regarding heat and ventilation.[22]

harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003) (marks and citation omitted).

In synthesizing the Supreme Court's objective and subjective component standards, we have said:

> A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment. See Helling v. McKinney, 509 U.S. 25, 113 S. Ct. 2475, 2480, 125 L. Ed. 2d 22 (1993). An Eighth Amendment violation will occur when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not "respond[] reasonably to the risk." Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970, 1982-83, 128 L. Ed. 2d 811 (1994). A plaintiff must also show that the constitutional violation caused his injuries.

Marsh v. Butler County, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc) (alteration in original). This standard is consistent with the Supreme Court's holdings, and we, of course, do not depart from it today. Because we hold that the inmates have failed to satisfy the objective component, we need not proceed any further in our analysis. See infra Part IV.

[22]Many courts have also considered claims brought by prisoners subjected to extreme cold, either alone or in combination with other prison conditions. See, e.g., Palmer v. Johnson, 193 F.3d 346, 349 (5th Cir. 1999) (affirming the district court's denial of summary judgment on

19

Gates v. Cook, No. 03-60529, 2004 U.S. App. LEXIS 13890 (5th Cir. July 9, 2004), concerned myriad conditions experienced by death row inmates at Mississippi's Parchman prison. The prisoners alleged that they were "subjected to profound isolation, lack of exercise, stench and filth, malfunctioning plumbing, high temperatures, uncontrolled mosquito and insect infestations, a lack of sufficient mental health care, and exposure to psychotic inmates in adjoining

the ground of qualified immunity to Texas prison officials who punished inmates on work detail by confining them outdoors overnight, where the inmates were not allowed to leave the space to use the restroom, were not given insect bite medication, were exposed to fumes from a nearby tractor engine, and endured 59 degree temperatures); Mitchell v. Maynard, 80 F.3d 1433, 1443 (10th Cir. 1996) (reversing the district court's grant of judgment as a matter of law for the Oklahoma prison officials and remanding the case for a jury trial to determine whether the prison conditions violated the Eighth Amendment; the court was "troubled by the lack of heat combined with the lack of clothing and bedding, the deprivation of exercise for an extensive period of time, the lack of hot water, the denial of toilet paper, the removal of [the inmate's] prescription eyeglasses, the lack of adequate ventilation and the denial of writing utensils"); Del Raine v. Williford, 32 F.3d 1024, 1035-36 (7th Cir. 1994) (reversing the district court's grant of summary judgment for federal prison officials, where the inmates alleged that the broken windows in the prison provided no relief from the outdoor wind chills of forty to fifty degrees below zero); Henderson v. DeRobertis, 940 F.2d 1055, 1060 (7th Cir. 1991) (reversing the district court's grant of j.n.o.v. to the Illinois prison officials, as well as the district court's dismissal of some of the consolidated cases on the ground of qualified immunity; the court held that a jury could have found in the inmates' favor, since the prison officials left the inmates "exposed to temperatures below freezing for four days without affording them any protection beyond that usually provided when the heating system functioned properly"); Corselli v. Coughlin, 842 F.2d 23, 27 (2d Cir. 1988) (reversing the district court's grant of summary judgment for the New York prison officials, where the inmate alleged "that he was deliberately exposed to bitterly cold temperatures for approximately three months in the fall and winter of 1983-84 when the large window frames in his cell block were empty," and that "it was so cold [that] there was ice in the toilet bowl" (marks omitted)); Lewis v. Lane, 816 F.2d 1165, 1171 (7th Cir. 1987) (reversing the district court's grant of summary judgment for the Illinois prison officials where the inmate alleged that his cell "temperature at times fell to between 52 and 54 degrees").

These "cold" cases provide us with a useful background for our analysis, though the "heat" and "ventilation" cases we go on to discuss are more relevant to our decision.

20

cells." Id. at *3. As to the claim regarding high temperatures, the district court found:

> The summer temperatures in the Mississippi Delta average in the nineties with high humidity, and Death Row is primarily not an air-conditioned facility. There are industrial type fans in the hallways to help with air circulation, and most inmates have smaller fans. Relief from the heat can be obtained by keeping the windows open in the cell using fans. But keeping the windows open increases the mosquito population in the cells since there are holes in the cell window screens and the screen gauge is not sufficient to keep mosquitoes out. The ambient temperature in the cells is within reasonable limits except during the summer months. The ventilation is inadequate to afford prisoners a minimal level of comfort during the summer months. The probability of heat-related illness is extreme on Death Row, and is dramatically more so for mentally ill inmates who often do not take appropriate behavioral steps to deal with the heat. Also, the medications often given to deal with various medical problems interfere with the body's ability to maintain a normal temperature. The inmates are not afforded extra showers, ice water, or fans if they don't have fans when the heat index is 90 or above.

Id. at *22-23. The district court found that several of the challenged prison conditions, including the heat, violated the Eighth Amendment. Id. at *3. The district court therefore entered numerous injunctions, including one that "direct[ed] [the prison officials] to provide fans, ice water, and daily showers when the heat index is 90 degrees or above, or alternatively to make such provisions during the months of May through September." Id. at *36-37. The

Fifth Circuit affirmed this injunction. Id. at *40.[23] Noting that the plaintiffs did

"not need to show that death or serious illness ha[d] yet occurred to obtain relief,"

id. at *37, the court held:

> Based on the evidence presented, we cannot say that the trial court's
> finding that the probability of heat-related illness is extreme at [the
> prison] was clearly erroneous. Thus, this condition presents a
> substantial risk of serious harm to the inmates. Again, based on the
> open and obvious nature of these conditions and the evidence that
> inmates had complained of symptoms of heat-related illness, the trial
> court's finding regarding [the prison officials'] deliberate indifference
> is not clearly erroneous.

Id. at 40.

The Gates court recognized the Fifth Circuit's earlier decision in Woods v.

Edwards, 51 F.3d 577 (5th Cir. 1995). Woods, a Louisiana prisoner, claimed

among other things "that his cell was inadequately cooled and that the high

temperature, while uncomfortable in itself, also contributed to [his] health

problems," including a "sinus condition." Id. at 581. The court affirmed the

district court's grant of summary judgment for the prison officials. Id. It held:

> Woods . . . has failed to present medical evidence of any significance
> nor has he identified a basic human need that the prison has failed to
> meet. While the temperature in extended lockdown may be

---

[23]The class consisted only of death row inmates residing in Parchman Unit 32-C, but the injunction "purport[ed] to apply to all of Unit 32." Gates, 2004 U.S. App. LEXIS 13890 at *37. The Fifth Circuit therefore "affirmed [the injunction] insofar as it applie[d] to Unit 32-C." Id. at *40.

22

> uncomfortable, that alone cannot support a finding that the plaintiff was subjected to cruel and unusual punishment in violation of the Eighth Amendment.

Id. (emphasis added).  In distinguishing Woods, the Gates court stated, "The Woods court found that Woods had not presented medical evidence sufficient to state an Eighth Amendment violation; Woods does not stand for the proposition that extreme heat can never constitute cruel and unusual punishment."  Gates, 2004 U.S. App. LEXIS 13890 at *39.

Mays v. Rhodes, 255 F.3d 644 (8th Cir. 2001), arose out of a lawsuit brought by the estate of a deceased prisoner.  Mays was an inmate in an Arkansas prison.  Id. at 646.  He died from heat exhaustion during work detail, though the outdoor temperature was only seventy-two degrees.  Id.  The estate "alleged that [the prison officials] violated [Mays's] Eighth Amendment rights by requiring him to continue working after he exhibited signs of heat exhaustion and by delaying medical treatment after he collapsed."  Id.  The Eighth Circuit reversed the district court's denial of qualified immunity to the prison officials.  Id.  The court noted the following facts:

> [A]lthough [Mays] was overweight at two hundred eighty pounds and six feet tall, he had been medically cleared, without restriction, for work detail.  Andrews, the officer who supervised [Mays's] hoe squad, provided hourly breaks, during which time inmates could drink water, use the bathroom, smoke, and rest.  Andrews testified at

23

> his deposition that [Mays] had not complained of, or displayed, any unusual physical condition prior to his collapse, and he was keeping up with the rest of the squad. After [Mays] collapsed, Andrews ordered him to get up. When [Mays] failed to respond, Andrews promptly called Lieutenant Teal for help. He then ordered another inmate to take water to [Mays], but [Mays] was unable to drink the water.

Id. at 647-48 (footnote omitted). In view of all of the surrounding circumstances, the court determined that (1) there was "no admissible evidence that would show that [the prison officials] knew [they were] compelling [Mays] to work in disregard of a known serious medical need"; id. at 649, and (2) the prison officials "responded in a quick, reasonable manner while still maintaining the necessary security of the hoe squad," id.

In Dixon v. Godinez, 114 F.3d 640 (7th Cir. 1997), Dixon, an Illinois prisoner, claimed that various conditions at his prison, including the poor ventilation, violated the Eighth Amendment. The court affirmed the grant of summary judgment for the prison officials on this claim. Id. at 641. It concluded,

> The district court correctly found that the poor ventilation at [the prison] in summer was not extreme enough to violate the constitution. Dixon's cell had a window which opened, while a small "chuckhole" in the door provided a minimum of cross-ventilation. Moreover, each cell had an electric fan. And Dixon has offered only conclusory allegations, without backing from medical or scientific sources, that the rank air exposed him to diseases and caused respiratory problems which he would not otherwise have suffered. Such conditions do not fall below "the minimal civilized measure of life's necessities."

24

Farmer v. Brennan, [511 U.S. at 834,] 114 S. Ct. at 1977.

Id. at 645.[24]

Keenan v. Hall, 83 F.3d 1083 (9th Cir. 1996), involved a collection of § 1983 claims brought by an Oregon prisoner. Keenan alleged "that average temperatures in his cell 'tended' to be either 'well above' or 'well below' room temperature," id. at 1091, and that the prison's ventilation system was inadequate, id. at 1090. The court treated these claims separately. It affirmed the grant of summary judgment for the prison official as to the temperature claim, since the allegations in Keenan's complaint merely suggested "that the temperature was not comfortable." Id. at 1091. It reversed the grant of summary judgment as to the ventilation claim, however. Id. at 1090. In his complaint, Keenan alleged that his cell was "[s]aturated with the [f]umes of [f]eces (thrown by some inmates), the smell of urine and vomit as well as other stale bodily odors." Id. (marks omitted). The court noted that these conditions, if proved at trial, might violate the Ninth Circuit's rule that "[i]nadequate ventilation and air flow violates the Eighth

_____

[24]On the other hand, the court reversed the district court's grant of summary judgment to the prison officials on Dixon's claim regarding extreme cold at the prison. Dixon, 114 F.3d at 641. The court noted that the prison officials "submitted no evidence refuting either the allegation that ice regularly forms on cell walls in winter, or that the average temperature was forty degrees." Id. at 642. In reaching its judgment, the court stated that "it is not just the severity of the cold, but the duration of the condition, which determines whether the conditions of confinement are unconstitutional." Id. at 643.

25

Amendment if it undermines the health of inmates and the sanitation of the penitentiary." Id. (marks omitted).

In Land v. Hutcheson, 794 F. Supp. 877 (E.D. Mo. 1992), Land, a Mississippi pretrial detainee, alleged that the lack of air conditioning at his jail violated his constitutional rights.[25] In denying this claim, the court stated,

> There are large ventilation fans installed in the jail, which run constantly during hot weather. Plaintiff admits that the fans do offer some relief and that no one, including himself, has suffered any medical injury from the lack of air-conditioning. Plaintiff concedes that his complaints about the temperature in the jail (i.e. being hot) [are] based upon periodic measurements of the temperature in the jail by himself and other inmates using a thermometer; or visitors would report various outside temperatures to him and other inmates and they would calculate the "heat index". He further concedes that the only "injury" alleged is that the heat is at times "irritating" (in reference to emotional disposition). The Court finds that the ventilation system is adequate and that plaintiff's discomfort does not rise to the level of a constitutional violation.

Id. at 884 (citation omitted).

The district court in Inmates of Occoquan v. Barry, 717 F. Supp. 854 (D.D.C. 1989), considered the prison condition claims of a class of inmates. In ordering broad relief for the prisoners, the court ruled,

Defendants must submit a proposal to the Court within 60 days on

---

[25]The court noted that "[a] pretrial detainee is protected by the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment," and considered Land's claims accordingly. Land, 794 F. Supp. at 882.

how to remedy the nonexistent ventilation system in most of the dorms. With the excessive numbers of inmates living in these open dormitories, a satisfactory plan must be devised to operate in both cold and hot weather. The current "natural" ventilation does not work in the cold months when windows are closed and the fans are turned off.

Id. at 867.

Brock v. Warren County, 713 F. Supp. 238 (E.D. Tenn. 1989), was a suit brought by the children of a deceased Tennessee inmate. Brock resided in the county jail for a single week in July 1986. Id. at 240. The court found that (1) there was "a severe heat wave" at the time of Brock's incarceration; (2) Brock was confined in the jail's hottest cell; (3) the cell housed seven inmates; (4) the cell had no air conditioning or fans; (5) the cell had a steel door rather than bars, and "a pan hole which was used to pass food to the inmates . . . was the only escape for air in the cell"; (6) the cell's only window, "approximately 18 by 24 inches in size, was located on the outside wall of the cell, and was covered by a steel plate during the time that . . . Brock was incarcerated"; (7) the cell's ventilation system was not working; (8) there was a shower in the cell, and the inmates' frequent showers made the cell very humid; and (9) a thermometer in the adjoining hallway, which was cooler than the cell, "read as high as 110 degrees during the day and as high as 103 degrees to 104 degrees at night." Id. at 240-41. Brock became ill in the

cell and died of consequences of heat stroke after being moved to a hospital.  Id. at

241.  The district court held that the prison officials violated Brock's Eighth

Amendment rights.  Id. at 242.

C.

Informed by the Eighth Amendment caselaw, we reach several conclusions.

First, the Eighth Amendment applies to prisoner claims of inadequate cooling and

ventilation.  Cooling and ventilation are distinct prison conditions, and a prisoner

may state an Eighth Amendment claim by alleging a deficiency as to either

condition in isolation or both in combination.  Nonetheless, while distinct, cooling

and ventilation are interrelated.  Under certain factual scenarios, cooling and

ventilation may be parts of a "seamless web for Eighth Amendment purposes."

Wilson, 501 U.S. at 305, 111 S. Ct. at 2327.[26]  The instant case is one such

_____

[26]One common dictionary defines "ventilate" as "to provide (a room or other enclosed space) with fresh or cool air."  Random House College Dictionary 1460 (Rev. ed. 1980) (emphasis added).  This disjunction illustrates that cooling and ventilation can be either relatively distinct (where a ventilation system merely introduces fresh air) or virtually indistinct (where a ventilation system introduces cool air).

Some cases have treated temperature and ventilation claims separately.  See Dixon, 114 F.3d at 641 ("We affirm the grant of summary judgment [for the Illinois prison officials] on the inadequate ventilation claim, and reverse on the claim of extreme cold."); Keenan, 83 F.3d at 1090-91 (affirming the district court's grant of summary judgment for the Oregon prison officials on the prisoner's temperature claim, but reversing the grant of summary judgment as to the inadequate ventilation claim).  The facts of these two cases illustrate why a court might take this bifurcated approach.  In Dixon, the prisoner complained that his cell was too cold and inadequately ventilated.  In this scenario, ventilation does not impact much upon temperature; the ventilation system in Dixon likely did not compound the coldness of the cell.  It is the reverse scenario—the one we deal with in the instant case, where a prisoner alleges excessive heat and

28

scenario. As the inmates state in their brief, "the essence of [their] claim is that the combination of harsh summer temperatures, high humidity, and inadequate ventilation have created unconstitutional conditions of confinement." We therefore consider all of these heat-related factors in reaching our judgment.

Second, the Eighth Amendment is concerned with both the "severity" and the "duration" of the prisoner's exposure to inadequate cooling and ventilation. Cf. Dixon, 114 F.3d at 643 ("[I]t is not just the severity of the cold, but the duration of the condition, which determines whether the conditions of confinement are unconstitutional."). That is, "[a] condition which might not ordinarily violate the Eighth Amendment may nonetheless do so if it persists over an extended period of time." Id. Severity and duration do not necessarily form a perfect sliding scale, but our analysis should be informed by a consideration of both factors.

---

inadequate ventilation—where a temperature claim and a ventilation claim are less easily distinguished. Keenan is a simpler matter: the prisoner could avoid summary judgment as to his ventilation claim because he pled sufficient facts (namely, that "the air was . . . saturated with the fumes of feces, urine, and vomit," 83 F.3d at 1090), but he could not avoid it as to his temperature claim because he "alleged only that average temperatures in his cell 'tended' to be either 'well above' or 'well below' room temperature." Id. at 1091. Thus, a court might distinguish between temperature and ventilation claims at the summary judgment stage if the prisoner has alleged specific facts bearing upon one challenged condition but not the other.

We do not wish to overstate the distinction between cooling and ventilation. We suspect that in most excessive heat cases, like the one before us, these two conditions will be almost inseparable. We nonetheless wish to make clear that a prisoner may state an Eighth Amendment claim by alleging a deficiency in either ventilation or cooling or both.

29

Third, a prisoner's mere discomfort, without more, does not offend the Eighth Amendment. See Woods, 51 F.3d at 581 ("While the temperature in extended lockdown may be uncomfortable, that alone cannot support a finding that the plaintiff was subjected to cruel and unusual punishment in violation of the Eighth Amendment."). Eighth Amendment claims are governed by the standards we discuss at length in Part III.A, supra. In particular,

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer, 511 U.S. at 837, 114 S. Ct. at 1979 (emphasis added).

Contrary to the inmates' assertions, the district court did not err when it recognized in its dispositive order that "'severe discomfort' is insufficient to establish the objective component of an Eighth Amendment conditions of confinement claim." The "severe discomfort" language comes from our decision in Chandler v. Baird, 926 F.2d 1057 (11th Cir. 1991). In that case, Chandler alleged, among other things, that his Eighth Amendment rights were violated by

> confinement in a cold cell with no clothes except undershorts and with a plastic-covered mattress without bedding; filth on the cell's floor and walls; deprivation of toilet paper for three days; deprivation of running water for two days; lack of soap, toothbrush, toothpaste,

30

and linen; and the earlier occupancy of the cell by an inmate afflicted with an HIV virus. The averments of a cold cell were supplemented by specifics: that the temperature was as low as 60 degrees, that it was "ice cold", that [Chandler] slept on the floor and on occasion huddled with a roommate, sleeping between two mattresses.

Id. at 1063. The district court determined that the jailer was entitled to qualified immunity and granted him summary judgment. Id. at 1064. We reversed. Id. at 1066. After surveying the Eighth Amendment cases dealing with excessive cold claims, we decided that Chandler was

> entitled to have the trier of fact determine whether the conditions of his administrative confinement, principally with regard to the cell temperature and the provision of hygiene items, violated the minimal standards required by the Eighth Amendment. We also conclude[d], although the district court did not reach the issue, that the right of a prisoner not to be confined in a cell at so low a temperature as to cause severe discomfort and in conditions lacking basic sanitation was well established in 1986. The defendants therefore were not entitled to summary judgment on the basis of qualified immunity.

Id. at 1065-66.

We do not find Chandler to be controlling here. First, the Chandler court, in rendering its judgment on qualified immunity, was concerned entirely with the law related to excessive cold claims; the court had no opportunity to treat an excessive heat or inadequate ventilation claim. Second, the Chandler court did not have the benefit of the Supreme Court's rulings in Wilson, Hudson, Helling, or Farmer. It was in these cases that the Court refined the Eighth Amendment framework that

31

governs our present cases.  See supra Part III.A.

The Chandler court did have the benefit of Estelle and Rhodes, but these foundational cases did not fully establish the current Eighth Amendment framework.  Estelle held "that deliberate indifference to serious medical needs of prisoners constitutes" an Eighth Amendment violation.  429 U.S. at 104, 97 S. Ct. at 291.  This ruling was landmark but limited.  Indeed, the Rhodes Court, writing nearly five years after Estelle, stated,

> until this case, we have not considered a disputed contention that the conditions of confinement at a particular prison constituted cruel and unusual punishment.  Nor have we had an occasion to consider specifically the principles relevant to assessing claims that conditions of confinement violate the Eighth Amendment.

452 U.S. at 345, 101 S. Ct. at 2398 (footnote omitted).  Rhodes applies more broadly to all conditions of confinement.  See supra Part III.A.  Nonetheless, it was not until after Chandler that the Supreme Court clearly delineated the objective and subjective components of Eighth Amendment claims.  See Wilson, 501 U.S. at 303, 111 S. Ct. at 2327 (adopting a "deliberate indifference" standard for the subjective component); Farmer, 511 U.S. at 847, 114 S. Ct. at 1984 (holding that a prison official is deliberately indifferent "if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it").  Furthermore, it was not until after Chandler that

32

the Supreme Court held that a prisoner "states a cause of action under the Eighth Amendment by alleging that [prison officials] have, with deliberate indifference, exposed him to [a condition] that pose[s] an <u>unreasonable risk of serious damage to his future health</u>." <u>Helling</u>, 509 U.S. at 35, 113 S. Ct. at 2481 (emphasis added).

The "severe discomfort" language from <u>Chandler</u> appears to be an anomaly in our jurisprudence. A quick Lexis search reveals that, after <u>Chandler</u>, we never again used that phrase in deciding an Eighth Amendment challenge. We have routinely used language found in the Supreme Court's post-<u>Chandler</u> cases, however. <u>See, e.g.</u>, <u>Marsh v. Butler County</u>, 268 F.3d 1014, 1028 (11th Cir. 2001) ("A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment." (citing <u>Helling</u>, 509 U.S. at 32-33, 113 S. Ct. at 2480)); <u>Bass</u>, 170 F.3d at 1317 ("Wantonness has been defined as 'deliberate indifference to a substantial risk of serious harm to a prisoner.'" (quoting <u>Farmer</u>, 511 U.S. at 836, 114 S. Ct. at 1978)). In the end, the Supreme Court's holdings, rather than the obsolete and potentially irrelevant phraseology of <u>Chandler</u>, must govern our analysis.

IV.

We recognize that Eighth Amendment claims have objective and subjective components. <u>See</u> <u>supra</u> Part III.A. Nonetheless, we need not consider the

33

subjective component in this case, because we conclude that the inmates at the Unit have failed to meet their burden under the objective component.[27] Cf. Helling, 509 U.S. at 35, 113 S. Ct. at 2481-82 ("We . . . affirm the remand to the District Court to provide an opportunity for [the inmate] to prove his allegations, which will require him to prove both the subjective and objective elements necessary to prove an Eighth Amendment violation. The District Court will have the usual authority to control the order of proof, and if there is a failure of proof on the first element that it chooses to consider, it would not be an abuse of discretion to give judgment for petitioners without taking further evidence."); Sims v. Mashburn, 25 F.3d 980, 984 (11th Cir. 1994) (expressing "serious doubt about whether" the prisoner satisfied the objective component, but nonetheless "choos[ing] to predicate [the] holding on the failure of proof as to [the subjective] component"). We reach this conclusion for the following reasons.

First, while no one would call the summertime temperatures at the Unit pleasant, the heat is not unconstitutionally excessive. The district court found that "the building mass remains at a relatively constant temperature, between approximately eighty degrees at night to approximately eighty-five or eighty-six

---

[27]The district court held that the inmates failed to satisfy either the objective or subjective component.

34

degrees during the day."  The cells were sometimes hotter than this, but not often.

According to the district court's dispositive order, "[o]n average, inmates on

the . . . Unit may have experienced temperatures over ninety degrees nine percent

of the time during the months of July and August 1998 and July of 1999."  During

those same months, "the temperature was recorded at ninety-five degrees or higher

on only seven occasions," and "there were no readings . . . that exceeded 100

degrees."  At the hottest times of the day, it is cooler in the cells than it is

outdoors.  In light of these facts, we agree with the district court's finding that "the

temperatures and ventilation on the . . . Unit during the summer months are almost

always consistent with reasonable levels of comfort and slight discomfort which

are to be expected in a residential setting in Florida in a building that is not air-

conditioned."[28]

Second, the Unit is equipped with a ventilation system that effectively

manages air circulation and humidity.  The system is designed to provide nearly

---

[28]The inmates do not appear to challenge the district court's failure to consider other temperature data, e.g., outdoor weather service temperature measurements, in reaching its judgment.  In any case, the district court's dispositive order makes clear that the court was wary of using outdoor temperature measures as a proxy for Unit cell temperatures.  The court rejected the testimony of one of the inmates' experts, Dr. Francis Dukes-Dobos, in part because his conclusions "were based on the erroneous assumptions that the inside temperatures on the . . . Unit mirror the outside temperatures and that the outdoor temperatures in Gainesville, as recorded by the national weather bureau, were identical to those on the . . . Unit for the same time period."

sixty air changes per hour, while typical systems of its kind are designed to provide only thirty or forty. The district court found that "[w]hen the ventilation system is running per design, the relative humidity in the building rarely rises above seventy percent, the humidity level needed to support the growth of mold and mildew[, and] heat, odors and contaminants are exhausted out of the building." The ventilation system appears to be "operating within the range of design parameters."[29]

Third, apart from the ventilation system, numerous conditions at the Unit alleviate rather than exacerbate the heat. The cells are not exposed to any direct sunlight because, as the district court found, "the attic acts as a buffer between the solar heat and the second floor cells of the . . . Unit by absorbing the solar radiation." The inmates are not required to wear many clothes, and most wear only shorts in the summer months. The district court determined that "every cell has a sink with hot and cold running water, and every inmate possesses a drinking cup." The inmates are generally sedentary; they may, but need not, exercise twice per week, and as far as the record discloses, they are not compelled to perform prison labor. Furthermore, the inmates have some limited opportunities to gain

---

[29]See supra note 15 and accompanying text.

The use of air handlers increases the air temperature and is, according to Dougherty's testimony, inefficient. See supra note 8 and accompanying text.

36

relief in air-conditioned areas, e.g., during visitation time.  See supra Part I.B.

We are sensitive to the inmates' plight, and we recognize that "constitutional rights don't come and go with the weather." Henderson v. DeRobertis, 940 F.2d 1055, 1059 (7th Cir. 1991).  But "extreme deprivations are required to make out a conditions-of-confinement claim" under the Eighth Amendment." Hudson, 503 U.S. at 9, 112 S. Ct. at 1000 (emphasis added).  Under the standards we apply, we cannot say that the prisoners at the Unit have cleared this high bar.

## V.

The judgment of the district court is accordingly

AFFIRMED.