Mark E. OSTERBACK,
et al., Plaintiffs,

v.

James R. McDONOUGH,
et al., Defendants.

Case No. 3:04–cv–210–J–25JRK.

United States District Court,
M.D. Florida,
Jacksonville Division.

March 25, 2008.

D. Gray Thomas, Matthew R. Kachergus, William J. Sheppard, Sheppard, White, Thomas & Kachergus, PA, Jacksonville, FL, Randall Challen Berg, Jr., Florida Justice Institute, Inc., Miami, FL, for Plaintiffs.

Caryl Kilinski, Susan A. Maher, Attorney General's Office, Tallahassee, FL, Kathleen M. Savor, Kathleen M. Savor, PA, Hollywood, FL, Maxine K. Streeter,

Conrad & Scherer, LLP, Ft. Lauderdale, FL, for Defendants.

## ORDER

HENRY LEE ADAMS, JR., District Judge.

### I. Status

On August 28, 1997, *pro se* Plaintiffs Mark Osterback, Thomas Gross and Darryl E. Williams initiated this case by filing a Civil Rights Complaint (Doc. # 1) pursuant to 42 U.S.C. § 1983 in the United States District Court for the Southern District of Florida. On November 19, 1997, they filed an Amended Complaint (Doc. # 16), captioned as a class action on behalf of all present and future inmates on close management (hereinafter CM) status[1] at Everglades Correctional Institution.

On March 3, 1999, counsel appeared on behalf of Plaintiffs. On November 1, 1999, counsel filed a Second Amended Complaint (Doc. # 91) (hereinafter SAC), seeking declaratory and injunctive relief. In the SAC, Plaintiffs allege that the Defendants house inmates assigned to CM under conditions so harsh, atypical and punitive as to amount to cruel and unusual punishment in deprivation of their rights under the Eighth Amendment. They contend that the restrictive conditions under which CM inmates are housed result in serious mental and physical deterioration.

On June 16, 2000, the Magistrate Judge assigned to the case recommended that Plaintiffs' Motion to Certify a Class (Doc. # 101) be granted (a class consisting of all persons who are currently assigned to CM in prisons operated by the Florida Depart-

---

**1.** CM is the confinement of inmates, separate from the general population, for reasons of security and for the order and effective management of the institution, because such inmates, through their individual behaviors, have demonstrated an inability to live in the general population without abusing the rights and privileges of other inmates. There are three levels of CM: CM I, CM II and CM III, with CM I being the most restrictive. All three CM levels carry with them significant restrictions of privileges.

ment of Corrections or who in the future will be assigned to CM, with three subclasses: (a) persons who are currently or will be assigned to CM I, (b) persons who are currently or will be assigned to CM II, and (c) persons who are currently or will be assigned to CM III) (Docs. # 116, # 117). On July 26, 2000, the court adopted the Magistrate Judge's Report and Recommendation (Doc. # 120).

On October 3, 2001, Plaintiffs filed a Notice of Acceptance of Defendants' Revised Offer of Judgment (Doc. # 241). The Revised Offer of Judgment (attached to Doc. # 241) (hereinafter ROJ) was intended to minimize the potentially harmful effects of CM by: (1) reducing the number of institutions that house CM inmates from ten institutions to four institutions (one for females at Dade Correctional Institution and three for males at Florida State Prison, Santa Rosa Correctional Institution and Charlotte Correctional Institution); (2) conducting staff training on mental health issues relevant to the CM population; (3) performing mental health screening before and after placement in CM to help ensure timely access to necessary mental health services; (4) assessing behavioral risk for each CM inmate, in order to provide more objective information to be used for mental health and other service planning and administrative decisionmaking; (5) providing a full range of outpatient mental health services (for example, group and individual counseling, case management, psychiatric consultation, psy-

chotropic medications and timely referral to inpatient care) that are commensurate with clinical need; and, (6) providing self-betterment/stimulation programming to CM inmates.

On December 26, 2001, the court entered an order finding that the scope of relief provided by the ROJ met or exceeded that which would have been ordered by the court if Plaintiffs had prevailed at a trial on the merits; finding that the relief set forth in the ROJ was sufficient to correct the violations of the federal right complained of by the Plaintiff class; adopting the ROJ as a Final Order and Judgment; retaining jurisdiction over the ROJ for the term stated therein; and directing that the clerk of the court administratively close the case. See Order Entering Defendants' Revised Offer of Judgment (Doc. # 383), filed December 27, 2001. The case was closed on December 27, 2001.

■ On December 19, 2003, Defendants filed Defendants' Motion to Terminate Revised Offer of Judgment (Doc. # 681), in which Defendants requested to have the injunctive relief that was included in the Order Entering Defendants' Revised Offer of Judgment (Doc. # 383) terminated in accordance with the Prison Litigation Reform Act (hereinafter PLRA)[2] and the express terms of Section VI of the ROJ.[3] Thereafter, Plaintiffs filed Plaintiffs' Motion to Reopen Discovery, and Restore Case to Trial Calendar (Doc. # 684), in which Plaintiffs requested that the court

---

**2.** The PLRA provides that, in "any civil action with respect to prison conditions in which prospective relief is ordered," such relief shall be terminable upon the motion of any party or intervener "2 years after the date the court granted or approved the prospective relief[.]" 18 U.S.C. § 3626(b)(1). Additionally, 18 U.S.C. § 3626(b)(2) provides that "a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the

relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."

**3.** The ROJ provides that the "injunction entered pursuant to this Offer of Judgment shall be subject to termination in accordance with the Prison Litigation Reform Act, 18 U.S.C. § 3626(b)." ROJ at 19.

reopen discovery and schedule an evidentiary hearing, affording the Plaintiffs the opportunity to prove that the injunction should not be terminated because there are current and ongoing violations of the class members' federal constitutional rights.[4]

After these two motions were filed, the Defendants filed a Motion to Transfer Venue (Doc. # 634), in which they argued that the case should be transferred to this Court for resolution of the two motions because, as a result of the implementation of the ROJ, there are no CM correctional institutions located in the Southern District. Plaintiffs did not object to the Motion to Transfer Venue, and the case was transferred to this Court.

On April 21, 2005, this Court entered an order finding that the ROJ was subject to termination pursuant to the PLRA and the express terms of the ROJ, and concluding that an evidentiary hearing was necessary to give the Plaintiffs the opportunity to prove that the conditions in CM are unduly harsh and punitive, in violation of Eighth Amendment, due to the combined long-term effect of: (1) the lack of training of CM staff regarding the mental health needs of CM inmates or the failure to adhere to any training that is provided; (2) inadequate mental health screening of CM inmates; (3) the failure to ensure that CM inmates have timely access to necessary mental health services; (4) the lack of qualified mental health staff at CM institutions; (5) the failure of the mental health staff to take any meaningful steps to ad-dress an inmate's mental health needs due to restrictions placed by security staff; (6) the housing of CM inmates in units that are unsuited for extended confinement; (7) the enforcement of unpromulgated and arbitrary rules prohibiting inmates from talking to each other; (8) the lack of access to the day-room and to reading materials, telephones, radios and television; (9) the lack of opportunity to exercise; and, (10) the inability of CM inmates to take advantage of educational opportunities, make canteen purchases or engage in visitation. *See* the Court's Order (Doc. # 718), filed April 21, 2005.

The Court gave the parties the opportunity to engage in discovery, and after granting several continuances, the evidentiary hearing commenced on Monday, September 11, 2006, and concluded on Thursday, September 21, 2006. Thirty-two CM inmates from the five institutions that currently house CM inmates testified[5] at the hearing. Three class representatives were present in the courtroom for the hearing and testified in person. The remainder of the inmate witnesses appeared in Court via the video-conferencing medium. Additionally, Plaintiffs called Chase Riveland as an expert in the field of corrections and Dr. Kathryn Burns as an expert in the field of psychiatry and the delivery of mental health services in correctional institutions. Plaintiffs also called several other fact witnesses and submitted two depositions. Dr. Roderick W. Hall testified on behalf of the Defendants as an expert in clinical psychiatry, program evaluation,

---

4. The PLRA provides that:

Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

18 U.S.C. § 3626(b)(3). Plaintiffs have the burden of proving current and ongoing constitutional violation(s). *Cason v. Seckinger*, 231 F.3d 777, 782–83 (11th Cir.2000).

5. As will hereinafter be explained, two of these inmates were incompetent and their testimony will be disregarded.

quality assurance and training. The Defendants also called Dr. John Martin as an expert in the delivery of psychiatric services in prison, Dr. Max A. Linn as a statistical expert and James R. Upchurch as an expert in the field of corrections. Finally, the Defendants called assistant wardens from each of the five CM institutions and several other fact witnesses.

The evidentiary hearing transcript (Doc. # 831 through Doc. # 839)[6] was filed on November 29, 2006. On February 27, 2007, the Defendants filed Defendants' Proposed Findings of Fact and Conclusions of Law (Doc. # 841). On February 28, 2007, Plaintiffs filed Plaintiffs' Proposed Findings of Fact, Conclusions of Law, and Order (Doc. # 842). Thus, this case is ripe for review.

## II. Rulings on Admissibility of Evidence

At the hearing, the Court deferred ruling on the admissibility of several exhibits and some testimony. Before making any findings of fact and conclusions of law, the Court will now address the admissibility of this evidence.

Defendants objected to the admission of PE[7] 9 and PE 10 (the 2001 and 2003 reports of Chase Riveland). V4 at 87–90. The Court provisionally admitted these exhibits and deferred ruling on the objection. V4 at 90. Later during the hearing, Plaintiffs notified the Court that these two exhibits were already part of the record (Doc. # 233 and Doc. # 586). V4 at 106–07. Thus, the Defendants' objections to these two exhibits are overruled, and these two exhibits shall be received as PE 9 and PE 10.

 Defendants also objected to the admission of PE 129 (a publication authored by Chase Riveland entitled, "Supermax Units Overview and General Considerations"). V4 at 167, The Court provisionally admitted this exhibit and deferred ruling on the objection. V4 at 167. Upon further review, the objection is overruled and PE 129 is admitted for the limited purpose of establishing the qualifications of Chase Riveland.

Defendants moved to strike the testimony of two incompetent inmate witnesses, Sherman Gainer and Joseph Berry. V5 at 211. The Court took the motion under advisement. V5 at 213. Given the fact that both parties agreed that these two inmates are incompetent, the motion is granted and their testimony is stricken.

Plaintiffs objected to DE 121 (a compilation of weekly status reports detailing compliance with the CM regulations). V8 at 122. The Court took the objection under advisement and the exhibit was not admitted into evidence. After the hearing, Defendants notified the Court that they were withdrawing this exhibit. See Defendants' Response to Plaintiffs' Supplemental Memorandum of Law in Support of the Exclusion of Defendants' Exhibit 121 (Doc. # 828), filed September 27, 2006. Thus, Plaintiffs' objection to this exhibit is moot.

Defendants moved the Court to accept DE 26 (the expert report of Dr. John Martin), and Plaintiffs objected to the expert report only to the extent that it contained an opinion regarding the standard of care in the community. V7 at 60–61. The Court took the motion to accept the evidence under advisement until the examination of Dr. Martin was completed. V7 at 61. Thereafter, Plaintiffs moved to strike the portion of the report pertaining to the community standard of care. V7 at

---

**6.** The evidentiary hearing transcript consists of nine volumes. The Court will hereinafter refer to these volumes as VI through V9.

**7.** The Court will hereinafter refer to Plaintiffs' Exhibits as "PE" and Defendants' Exhibits as "DE."

116. The Court denied the motion to strike. V7 at 116. After the examination of Dr. Martin was completed, the Court did not rule on the motion to accept this exhibit. *See* V7 at 143. Thus, the Court now grants the motion and receives DE 26 into evidence.

█ Plaintiffs objected to the admission of DE 52D (the American Correctional Association Accreditation Reports for Charlotte CI [8]) on the basis that the reports were hearsay. V8 at 99. The Court took the objection under advisement. V8 at 100. Plaintiffs also objected to the admission of DE 52C (the American Correctional Association Accreditation Reports for Santa Rosa CI) on the basis that the reports were hearsay. V8 at 149. The Court took the objection under advisement. V8 at 149. Neither exhibit was admitted at the hearing. Upon review, the objections are sustained and the exhibits will not be received into evidence.

The Court also accepted the depositions of Victoria Pence and Dr. Craig W. Haney as PE 298 and PE 299, respectively. V6 at 8, 10. However, the Court directed the parties to designate the portions of these depositions that they wanted the Court to consider. V6 at 8. The Court also gave the parties ten days to object to those portions of the depositions identified as relevant by opposing counsel. V6 at 8.

On September 19, 2006, Plaintiffs provided the Court and opposing counsel with Plaintiffs' Notice of Designation of Dr. Craig Haney's Deposition Excerpts. V7 at 48–51; PE 298A. On September 26, 2006, Defendants filed Defendants' Objections to Plaintiffs' Notice of Designation of Dr. Craig Haney's Deposition Excerpts (Doc. # 825). Upon review, the Defendants' objections are overruled.

On September 26, 2006, Defendants' Notice of Designation of Dr. Craig Haney's Deposition Excerpts Craig Haney Deposition Dated August 31, 2005 (Doc. # 826) was filed. Plaintiffs did not file any objections to the portions of Dr. Haney's deposition that were identified by Defendants. Therefore, the Court will consider those portions of Dr. Haney's deposition that were identified by the Defendants and the Plaintiffs as being relevant.

### III. Findings of Fact and Conclusions of Law

#### A. Relevancy and Credibility Determinations

In making these findings of fact, the Court focused on the relevant evidence regarding current and ongoing conditions. Thus, testimony and other evidence regarding incidents that allegedly occurred several years ago was generally disregarded. Additionally, the Court focused on evidence concerning the conditions in CM. Some of the inmates who appeared at the evidentiary hearing testified about conditions in disciplinary confinement, which are much more restrictive and harsh than the conditions in CM.[9] *See* PE 45. The conditions in disciplinary confinement are not at issue in this case; therefore, such irrelevant testimony and evidence was disregarded.

Although the Plaintiffs' and Defendants' mental health experts were eminently qualified to render opinions in their fields

8. The Court will hereinafter refer to the term "Correctional Institution" as "CI."

9. In fact, the Court was distressed to hear that several CM inmates have remained in disciplinary confinement for years and years at a time. The isolation and severe conditions that these inmates have experienced for such a long period of time may well rise to the level of an Eighth Amendment violation; however, as noted before, the conditions in disciplinary confinement are not before this Court in this case. Furthermore, such isolated cases would more appropriately be addressed in individual civil rights actions rather than a class action suit.

of expertise, the Court finds the following, based on the credible evidence presented.

### B. General Eighth Amendment Law

As noted previously, Plaintiffs allege that the Defendants house inmates assigned to CM under conditions so harsh, atypical and punitive as to amount to cruel and unusual punishment in deprivation of their rights under the Eighth Amendment. They also contend that the restrictive conditions under which CM inmates are housed result in serious mental and physical deterioration.

> The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The "cruel and unusual punishments" standard applies to the conditions of a prisoner's confinement. *Rhodes v. Chapman,* 452 U.S. 337, 345–46, 101 S.Ct. 2392, 2398–99, 69 L.Ed.2d 59 (1981)....
>
> Even so, "the Constitution does not mandate comfortable prisons." *Id.* at 349, 101 S.Ct. at 2400. If prison conditions are merely "restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 347, 101 S.Ct. at 2399. Generally speaking, prison conditions rise to the level of an Eighth Amendment violation only when they "involve the wanton and unnecessary infliction of pain." *Id.*

*Chandler v. Crosby,* 379 F.3d 1278, 1288–89 (11th Cir.2004) (footnote omitted).

 "The Supreme Court has developed a two-part analysis to govern Eighth Amendment challenges to conditions of confinement." *Id.* "First, the deprivation alleged must be, objectively, 'sufficiently serious[.]'" *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The second component is objec-

tive: "the prisoner[s] must show that the defendant prison officials 'acted with a sufficiently culpable state of mind' with respect to the condition[s] at issue." *Chandler,* 379 F.3d at 1289 (quoting *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). "In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety[.]" *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970 (quoting *Wilson,* 501 U.S. at 303, 111 S.Ct. 2321). "*Wilson* and subsequent cases refer to these two required elements as an 'objective component' scrutinizing the alleged deprivation and a 'subjective component' examining the official's mental intent." *Campbell v. Sikes,* 169 F.3d 1353, 1363 (11th Cir.1999).

 The objective component of an Eighth Amendment claim is "contextual and responsive to 'contemporary standards of decency.'" *Hudson,* 503 U.S. at 8, 112 S.Ct. 995 (citation omitted). To satisfy the objective prong for a conditions of confinement claim, "extreme deprivations are required." *Id.* at 9, 112 S.Ct. 995. Thus, only the deprivations denying "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation. *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *see also Chandler,* 379 F.3d at 1289.

"Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson,* 501 U.S. at 305, 111 S.Ct. 2321. In *Wilson,* the Supreme Court noted that:

> Some conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temp-

erature at night combined with a failure to issue blankets.

*Id.* at 304, 111 S.Ct. 2321.

The Eighth Amendment protection against deliberate indifference to prisoners' serious medical needs extends to conditions that threaten to cause health problems in the future, as well as current serious health problems. *Helling v. McKinney,* 509 U.S. 25, 32–33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (addressing an Eighth Amendment complaint by an inmate regarding exposure to second-hand smoke). Thus, conditions that pose an unreasonable risk of serious damage to the Plaintiffs' future health meet the objective component of an Eighth Amendment claim. *Id.* at 35, 113 S.Ct. 2475.

Also with respect to the objective factor, determining whether [the Plaintiffs'] conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [harsh conditions]. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

*Id.* at 36, 113 S.Ct. 2475.

With respect to the subjective component of an Eighth Amendment violation, a prisoner must show that the defendant prison officials were deliberately indifferent to the risk of serious harm.

The proper standard is that of deliberate indifference. *Wilson v. Seiter,* 501 U.S. 294, 303, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991). Negligence does not suffice to satisfy this standard, *id.* at

305, 111 S.Ct. at 2328, but a prisoner need not show that the prison official acted with "the very purpose of causing harm or with knowledge that harm [would] result," *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994). In defining the deliberate indifference standard, the Court stated:

[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837, 114 S.Ct. at 1979. Furthermore, the official may escape liability for known risks "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844, 114 S.Ct. at 1982–83.

*Chandler,* 379 F.3d at 1289–90. In sum, a deliberate indifference claim has three components: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than negligence." *Id.* at 1290 n. 21 (quoting *Farrow v. West,* 320 F.3d 1235, 1245 (11th Cir.2003)).

### C. Findings Regarding the Ten Relevant Factors

(1) **Findings with respect to the alleged lack of training of CM staff regarding the mental health needs of CM inmates and the alleged failure to adhere to any training that is provided.**

The ROJ provides that "[a]ll security, classification, and program staff assigned to the four designated CM institutions shall receive training on suicide prevention

(2 hours) and other mental health issues of relevance to care of CM inmates (3 hours), within 60 days after assignment and annually thereafter." ROJ at 6. In accordance with the ROJ, the DOC provides these two courses to train DOC staff on mental health issues with CM inmates, and provides refresher training annually. V6 at 123; V8 at 133–34, 157–58, 182, 193–94; V9 at 25; PE 299 at 92.

The first course is entitled, "Incarceration Management." V6 at 123. This course lasts approximately three hours. V8 at 53. In this course, the various signs and symptoms of the major mental disorders are described as well as the possible impact of those disorders on inmates housed in CM units. V6 at 123; V8 at 44. The course also teaches officers to recognize behaviors that are associated with various mental health disorders and to make appropriate referrals to mental health professionals. V8 at 44.

This course also teaches the officers crisis de-escalation procedures, how to be an active listener and how to interact with CM inmates. V8 at 44–45. Training on de-escalation procedures includes learning techniques to avoid threatening the inmate, such as not staring at the inmate directly in the eyes, not standing directly in front of the inmate, standing to the side of the inmate in a nonthreatening manner, attempting to ascertain what is wrong with the inmate, and attempting to resolve the situation. V8 at 136.

The second course focuses on suicide prevention and lasts approximately two hours. V6 at 123; V8 at 53. This course was designed to acquaint staff with the various warning signs of suicide risk and to advise staff that it is necessary to immediately refer any individual displaying those warning signs to the appropriate health care staff for follow-up. V6 at 123; V8 at 43. This course also trains officers how to respond to suicide attempts. V8 at 43.

These two courses are delivered by videotape. V6 at 124. The presenter on the tape is a licensed psychologist; however, the facilitator who plays the videotape may or may not be a mental health professional. V6 at 124–25; V8 at 184. Typically, a mental health professional appears at the end of the session to answer any questions that the participants may have. V6 at 124; V8 at 184.

CM staff are also trained on how to respond to inmates who refuse mental health care. V8 at 45. They are taught to continually observe the situation and to refer the issue to mental health professionals. V8 at 45.

If an inmate declares a psychological emergency, CM staff members are trained to take the threat seriously, to notify mental health staff, and to ensure that mental health staff respond to the dormitory to intervene. V8 at 135, 158, 183; V9 at 26. If the inmate is compliant, officers are trained to restrain him and to try to remove him from anything he may use to harm himself until mental health staff arrive. V8 at 135, 158. If an inmate is not compliant, the staff member is trained to constantly observe the inmate until mental health staff arrive. V8 at 135.

The Court finds that CM staff are adequately trained on suicide prevention and other mental health issues of relevance to the care of CM inmates. DE 25 at 12.[10]

---

**10.** Dr. Burns testified that "it would appear that the training [of CM staff] is insufficient based on ... the numbers of mentally ill [inmates] we found in the CM units." V3 at 191; PE 14 at 6. However, she admitted that she did not review any lesson plans or view any training tapes, nor did she attend any of these training sessions. V4 at 20; PE 14 at 6. Thus, the Court did not find her opinion regarding the adequacy of training to be persuasive.

The training that is provided comports with the constitutional guarantee against cruel and usual punishment. *See* Defendants' Proposed Findings of Fact and Conclusions of Law (Doc. # 841) at 60–62.

However, the record reveals that some correctional officers do not always adhere to that training. Some inmates reported that some officers occasionally ignore inmates who declare a psychological emergency by telling them to wait until a person from the mental health staff comes by the cell or by stating that they will not take any action in response to the declared emergency unless the inmate cuts himself or otherwise attempts to harm himself.

For example, inmate Carl Mullings testified that he heard an inmate declare a psychological emergency[11] in March of 2006, and the officer told the inmate to wait until mental health staff came by the cell to declare his psychological emergency. V1 at 67–68. *See also* V1 at 165–68 (relaying an instance where an officer ignored an inmate's repeated declarations of a psychological emergency at Charlotte CI, another instance where the officer told the inmate he had to "see blood" before he would receive emergency psychological care, and another instance where an officer ignored a CM inmate's declaration of a psychological emergency and the inmate thereafter cut himself); V2 at 110 (testifying that an officer told an inmate that he had to "see blood" before he would receive emergency psychological care); V3 at 32–34 (relaying an instance where an inmate declared a psychological emergency, which was ignored, and was only taken out of her cell after cutting herself); V5 at 16–17 (testifying that he declared a psychological emergency and the officer ignored his request to see a doctor); V5 at 33–42 (relaying an instance where officers repeatedly

ignored inmate Tony Phillips when he declared psychological emergencies throughout the day, and then inmate Tony Phillips committed suicide by hanging himself); V5 at 69–70 (testifying that he declared a psychological emergency and the officer told him that they do not respond to psychological emergencies "unless they see blood"); V5 at 190 (testifying that he had to cut himself to obtain psychological assistance); V5 at 242–43 (relaying an instance where correctional officers did not respond to an inmate who declared a psychological emergency and the inmate thereafter took some pills and cut himself); PE 14 at 12; PE 298 at 239.

Other inmates reported that CM inmates were sometimes sprayed with chemical agents or beaten, in response to declaring a psychological emergency instead of being referred to mental health staff. V1 at 171–72 (relaying an instance where an inmate was sprayed with chemical agents in response to his declaring a psychological emergency); V5 at 13 (testifying that he has observed several inmates being beaten or sprayed with chemical agents "just for declaring a psychological emergency").

However, the record also reflects that some inmates occasionally declare a psychological emergency for secondary gain (secondary gain is doing something for some other purpose than the initial request, such as an inmate declaring that he is suicidal, even though he is not, so that he can be removed from CM and placed in an air-conditioned crisis stabilization unit, *see* V4 at 57). For example, inmate Lavictor Flournoy testified that he has no mental health needs, but he has declared psychological emergencies for non-mental health reasons, such as when he was

---

**11.** This inmate also testified about instances when he declared psychological emergencies; however, the most recent instance was in January of 2003, which is too long ago to be considered in this Court's assessment of current and ongoing violations. *See* V1 at 36.

threatened or harassed by others and when officers refused to let him shower and left him in his cell with his hand-cuffs on until the shift changed. V2 at 241, V3 at 16. The time that he declared a psychological emergency because he was left in his cell with his hand-cuffs on, he did so to document that he had handcuffs on all night. Nevertheless, the male nurse who responded referred him to mental health staff the following day. V3 at 15–16. Inmate Lanora Malone declared a psychological emergency merely because an officer allegedly lied about something she had done. V3 at 115. Victoria Pence, a former psychiatric nurse who worked at Santa Rosa CI in 2005, testified that inmates with no history of mental illness would threaten suicide in the summer so that they would be placed in an air-conditioned isolation management room. PE 299 at 89, 99.

Clearly, if an inmate declares a psychological emergency for secondary gain, not because he is actually suffering from severe psychological distress, there would not be an Eighth Amendment violation if the officer ignored the inmate. However, the Court must inquire whether the occasional failure of CM officers to adhere to their training by failing to respond to a *bona fide* psychological emergency (such as where an inmate is threatening to harm himself or kill himself) rises to the level of an Eighth Amendment violation.

 Prisoners have the right "to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1115 (11th Cir.2005) (quoting *Hamm v. DeKalb County*, 774 F.2d 1567, 1574 (11th Cir.1985)). To establish an Eighth Amendment violation for failure to protect against self-in-flicted injuries, a prisoner must show that the prison official(s) displayed deliberate indifference to the prisoner's threat of taking of his own life. *Id.*

"To establish a defendant's deliberate indifference, the plaintiff has to show that the defendant had '(1) subjective knowledge of a risk of serious harm; [and] (2) disregard[ed] ... that risk; (3) by conduct that is more than mere negligence.'" [*Cagle v. Sutherland*, 334 F.3d 980] *Id.* at 987 [ (11th Cir.2003) ] (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir.1999)). Under this Circuit's precedent, in a prison suicide case, deliberate indifference requires that the defendant deliberately disregard "a strong *likelihood* rather than a mere possibility that the self-infliction of harm will occur." *Id.* at 986 (emphasis in original) (quoting *Popham v. City of Talladega*, 908 F.2d 1561, 1563 (11th Cir.1990)). "[T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners." *Id.* (quoting *Tittle* [*v. Jefferson County Com'n*], 10 F.3d [1535] at 1540 [ (11th Cir.1994) ]). *Id.*

 The record reflects that there are some isolated instances where an inmate truly was suicidal or otherwise suffered from severe psychological distress, the officer(s) who responded to the declared psychological emergency failed to summon mental health staff despite the inmate's apparent distress, and the inmate thereafter attempted to commit suicide (and in one case actually committed suicide) or otherwise harmed him or herself. Those isolated cases rise to the level of an Eighth Amendment deliberate indifference claim.

 Furthermore, situations where a CM officer assaults an inmate who declares a psychological emergency instead of summoning mental health staff also vio-

late the Eighth Amendment. *See Valdes v. Crosby*, 450 F.3d 1231, 1236 (11th Cir. 2006) (finding that, in its prohibition against cruel and unusual punishments, the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners, and noting that "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society") (quoting *Farmer*, 511 U.S. at 832, 114 S.Ct. 1970). The record reflects that there may be some isolated instances where a CM officer assaulted an inmate who declared a psychological emergency instead of summoning mental health staff.

The Court will not address whether the isolated Eighth Amendment violations identified above are sufficient to warrant further enforcement of the ROJ until the Court has made findings with respect to the remaining nine factors at issue in this case.

**(2) Findings with respect to the allegedly inadequate mental health screening of CM inmates.**

The DOC has a classification system that rates an inmate's mental health from grade S1 through grade S5. V3 at 163–65; V6 at 90. The mental health grade system is designed to classify individuals in the prison system in accordance with their level of impairment and their level for need of services. V6 at 93, 95.

An inmate with an S1 grade does not have any current mental health needs, V3 at 163; PE 14 at 5; DE 26 at 5. An inmate with an S2 grade has mild impairment in adaptive functioning within general inmate housing, but can be managed in the population with appropriate case management and brief psychological counseling, when

necessary. V3 at 163; PE 14 at 5; DE 26 at 5. An S2 inmate may have a psychiatric diagnosis, but he or she would not be considered to be seriously and persistently mentally ill. V3 at 163–64; PE 14 at 5. Inmates with mental retardation are also assigned an S2 grade. V3 at 164. An inmate with an S3 grade has moderate impairment in adaptive functioning due to an Axis I disorder (a serious mental illness such as schizophrenia, bipolar disorder or major depression) or a personality disorder (either a schizotypal or a borderline personality disorder). V3 at 164; PE 14 at 5; DE 26 at 5–6. An S4 grade is reserved for inmates who require in-patient treatment in a transitional care unit. V3 at 164–65. Finally, an S5 grade is given if the inmate requires intensive treatment in an isolation management room, transfer to a crisis stabilization unit or psychiatric hospitalization. V3 at 165; PE 14 at 6.

The DOC has a mental health screening process upon an inmate's intake to the DOC. V6 at 94. Inmates are received into the DOC at a reception center. V6 at 94. On the day of an inmate's arrival at a reception center, health care staff screen the inmate for acute mental health issues. V6 at 94–95. Within eight days of an inmate's arrival at a reception center, an inmate receives a full mental health screening, which includes a clinical interview, psychological testing, intelligence quotient testing, and testing of the inmate's "relative level of hopelessness." V6 at 95. On the basis of the clinical interview and the results of the various tests, an inmate is assigned a mental health grade. V6 at 95. The DOC is complying with this intake screening procedure, which is appropriate and satisfactory. V6 at 95.[12]

---

12. In making any findings that the DOC is complying with the pertinent standards or procedures, the Court has utilized an eighty percent compliance measure, which is commonly used in evaluating programs. *See* V6 at 87–89.

Before any inmate is placed into CM, the classification supervisor at that particular institution ensures that a mental health referral form is completed and sent to mental health staff. V8 at 110. Mental health staff then interview the inmate, look at his medical history and decide whether the inmate may be placed in CM or whether the inmate needs in-patient mental health care. V6 at 96; V8 at 110. This mental health assessment advises the decision-makers (typically the classification staff) what level of mental health care the inmate needs. V6 at 96. If the inmate requires in-patient mental health care, the inmate is placed in an in-patient facility instead of being placed in CM. V8 at 111. The DOC is complying with these assessment procedures. V6 at 96.

There are also mental health screening procedures for inmates after they have been placed in CM. V6 at 98. Inmates who are classified as grade S3 must undergo a mental status examination within five days of placement in CM, and then every thirty days thereafter. V6 at 98–99. Inmates who are classified as grade S2 must undergo a mental status examination within thirty days of placement in CM, and then every ninety days thereafter. V6 at 98. The DOC is complying with these assessment procedures, which are adequate. V6 at 99, 104.

After an inmate is in CM, the classification team relies upon a behavioral risk assessment to determine the inmate's progress through the CM system. V8 at 111–12. Mental health staff complete a portion of this assessment and the inmate's mental health is one factor that is considered in making the assessment. V8 at 111.

Based upon the above factual findings and the expert report of Dr. Roderick Hall, *see* DE 25B at 12, the Court finds that the DOC's mental health screening of CM inmates is more than adequate and is in substantial compliance with the terms of the ROJ. See ROJ at 6–9. The Court further finds that the DOC is complying with these screening procedures. Clearly, the DOC's mental health screening procedures do not result in any Eighth Amendment violation. *See* Defendants' Proposed Findings of Fact and Conclusions of Law (Doc. # 841) at 58–59.

**(3) Findings with respect to the alleged failure to ensure that CM inmates have timely access to necessary mental health services.**

CM inmates are advised of their points of access to the mental health system. V6 at 99; DE 26 at 20. Inmates are advised that they may access mental health services by participating in group and/or individual therapy, by submitting an inmate request form, or, in the case of an emergency, by declaring a mental health emergency to any staff member. V4 at 22; V6 at 100–01; V8 at 136–37.

Medical staff conduct rounds daily, and dispense medication during these rounds. V8 at 147. Mental health care staff also visit CM units on a weekly basis [13] to ask, or attempt to ask, the inmates whether they have any mental health issues or needs. V1 at 71, 81; V2 at 46, 94; V4 at 21; V6 at 101; V8 at 97, 147. If the inmate does have a mental health need, he or she is scheduled for a follow-up interview and then called out to an interview room for that interview. V6 at 101.

**13.** The Defendants' expert statistician, Dr. Max Linn, conducted a statistical analysis that demonstrated the DOC was complying with the weekly mental health rounds requirement approximately ninety-one percent of the time at Lowell CI, ninety-two percent of the time at Union CI, ninety-five percent of the time at Florida State Prison, ninety-six percent of the time at Charlotte CI and ninety-seven percent of the time at Santa Rosa CI. V6 at 218–221; DE 24.

Sick call is a time each day that medical staff members make themselves available to discuss any concerns an inmate may have about his health. V6 at 102. During sick call, a medical staff member travels to the CM unit to visit each inmate so that the inmate can tell the staff member if he has a sick call issue. V6 at 103; V8 at 97. Inmates may access mental health care by telling the nurse that they have a mental health emergency. V6 at 103.

As noted previously, inmates may access mental health care by submitting an inmate request form. In the records reviewed Dr. Roderick Hall, such requests were very common. V6 at 104–05. The responses to these requests were generally timely and appropriate to the issue raised by the inmate. V4 at 23; V6 at 105.

Inmates are also offered counseling, if it is needed. V6 at 110. Inmates with an S2 or S3 grade generally have access to at least one hour of counseling each week. V6 at 110–11. The record reflects that S2 and S3 grade CM inmates are receiving at least one hour of counseling per week. V6 at 111. In addition to individual counseling, CM inmates are offered and engage in group therapy. V2 at 95; V3 at 54, 84; V5 at 187–88, 236; V7 at 99; V8 at 117, 144–45, 171; V9 at 13. Both individual and group therapy are being provided in an appropriate manner. V7 at 99–100.

Inmates may also access mental health care by declaring a psychological emergency if the inmate requires immediate assessment and/or treatment. V6 at 111. The inmate may declare a psychological emergency to any staff member.[14] V6 at 111. DOC policy requires the staff member to immediately refer that inmate to health care staff. V6 at 111. As noted above, some inmates have reported that some staff members occasionally refuse to refer an inmate who has declared a psychological emergency to health care staff; however, other inmates report that mental health staff is summoned when an inmate declares a psychological emergency. V1 at 40; V3 at 33–34, 64, 105, 115–18, 120–21; V5 at 116.

The DOC has a case management system, whereby a case manager is assigned to work closely with an inmate to coordinate his or her mental health care. V6 at 105–06. This case manager coordinates the inmate's care with the psychiatrists, psychologists and nurses to ensure that the inmate has good access to mental health care. V6 at 106. Inmates with an S2 classification meet with their case managers a minimum of every sixty days. V6 at 106. Inmates with an S3 classification meet with their case managers a minimum of every thirty days. V6 at 106–07. These case management reviews are being conducted and are satisfactory. V6 at 107.

14. Correctional officers are required to check on CM inmates every thirty minutes. V8 at 116, 155, 177; V9 at 18. Medical staff make rounds in the CM dormitories daily and mental health staff make rounds weekly. V8 at 116, 155, 177; V9 at 18–19. The housing supervisor is required to make rounds daily. V8 at 116. Meals are delivered three times per day. V8 at 117, 177. A classification officer makes rounds daily with a sealed box, in which inmates may place inmate request forms. V8 at 119. Depending on the institution, inmate runners and laundry officers make rounds in the dormitories either daily, two to three times a week or once a week to exchange laundry. V8 at 117; V9 at 20–21. The colonel, assistant wardens and the warden make rounds at least weekly. V8 at 116, 176; V9 at 18. Educational staff make rounds at least once a week. V8 at 116, 177. The chaplain also makes weekly rounds. V8 at 116. Thus, CM inmates have many opportunities to declare a mental health emergency to other staff members if the correctional officer who initially responds to a declared psychological emergency ignores the inmate's request for assistance.

Inmates with mental health problems also have an individual service plan. V6 at 107. This plan for the treatment of an inmate is drafted by a multi-disciplinary team consisting of a psychiatrist, a senior psychologist, a case manager and a psychologist specialist with a master's degree in psychology. V7 at 91. This document summarizes the inmate's mental health issues which are the focus of the inmate's current treatment. V6 at 107. It also outlines the goals or objectives of the treatment and the interventions to help accomplish those goals. V6 at 107. Additionally, the plan identifies the professional who is responsible for carrying out these interventions. V6 at 107.

An individual service plan is a well-accepted standard of care in clinical settings. V6 at 108. Such a plan provides a record so that providers can understand which treatments have been positive and measure the relative degree of progress. V6 at 108. If the progress is not satisfactory, the plan provides for a means to modify the interventions or other activities to benefit the inmate. V6 at 108. Finally, the plan provides for continuity of care and accountability for appropriate care. V6 at 108. The record reflects that inmates have such individual service plans and these plans are complete and adequate. V6 at 108–09; V7 at 91–95.

The DOC also conducts clinical case summaries. V6 at 109. A clinical case summary is a clinical review of a particular case, which includes a review of the history of the case, the current problems the inmate is experiencing, and the current interventions that are being used to address those problems. V6 at 109. This review is done to ensure that the current focus of care is adequate and the current level of care is sufficient to meet the documented needs of the inmate. V6 at 109. These clinical case summaries are typically conducted on a yearly basis, and sometimes more frequently if the need arises. V6 at 109–10. These clinical case summaries are being conducted in a timely and adequate manner. V6 at 110.

The inmates with psychiatric problems are psychiatrically evaluated. The psychiatric evaluations conducted by the DOC are memorialized on a six-page form and include the history of the inmate's present illness, the diagnosis and an initial treatment plan. V7 at 69. These evaluations are being conducted in a timely and adequate manner. V7 at 69–73.[15] The history of CM inmates' present illnesses are adequately reflected on these forms. V7 at 75–78.[16]

A psychiatrist is supposed to meet with a patient for a regular follow-up examination at least once a month to evaluate his mental status, to assess the effect of medication, to ascertain if there are any side effects from taking the medication, to gauge the improvement or need for a change in medication or dosage and to order additional laboratory tests, if needed. V7 at 98. These follow-up examinations are being conducted. V1 at 80; V2 at 36–38; V5 at 31, 201–02, 227; V7 at 98–99.

Psychiatrists conduct a medical status examination almost every time they meet with an inmate. V7 at 79. This type of examination assists the psychiatrist in diagnosing an inmate and determining whether the inmate requires medication. V6 at 79. These medical status examinations are being conducted in a timely, complete and adequate manner. V7 at 79–80.

---

**15.** Of the 302 CM inmate medical records reviewed by Dr. John Martin, only three contained untimely or inadequate psychiatric evaluations. V7 at 69–73.

**16.** Dr. Martin found that 295 of the 302 CM inmate medical records he reviewed were adequate in this regard. V7 at 78.

The psychiatrists within the DOC are generally making diagnoses that are consistent with the CM inmates' histories and evaluations. V7 at 83–85.

Before an inmate begins taking medication, DOC policy requires that baseline laboratory tests and a baseline cardiogram be conducted. V7 at 85. Periodically, thereafter, laboratory tests are conducted to ensure that the inmate is not being harmed by the medication. V7 at 85. These laboratory tests are being conducted in a timely and appropriate manner. V7 at 85–88.

DOC officials are required to obtain written consent from an inmate prior to administering medication to that inmate. V7 at 89. The DOC is obtaining this consent in the vast majority of cases. V7 at 89–91. The medications that are prescribed for CM inmates with psychological or psychiatric disorders are appropriate for the target symptoms these inmates exhibited and the medications are being appropriately administered. V7 at 88–89.

Sometimes DOC officials are not required to obtain consent to administer medications in an emergency situation. V7 at 95. Such a situation might arise if an inmate is a danger to himself or others and the inmate refuses to give consent or there is insufficient time to obtain consent. V7 at 95. In such a case, a psychiatrist will issue an emergency treatment order and security staff will restrain the inmate so that the medication can be administered. V7 at 95.

The DOC utilizes an isolation management room to temporarily house a CM inmate who is suicidal, in a very manic state, psychotic or otherwise a danger to himself or others. V7 at 96. An inmate may also be admitted to a crisis stabilization unit or a transitional care unit if the inmate requires a higher level of inpatient care. V7 at 97.

Inmates also have the right to refuse mental health care. V4 at 56; V6 at 128; DE 26 at 19; DE 25B at 13. In fact, inmates often refuse such care for a variety of personal reasons. V1 at 56, 59, 105, 183–84; V2 at 63–64; 94; V3 at 123; V6 at 128. If an inmate refuses mental health services, a mental health clinician speaks with that inmate about the refusal. V8 at 17. If the inmate continues to refuse services, he is asked to sign a refusal form, which is witnessed by the clinician and a third party. V8 at 17. In the inmate refuses to sign the form, the clinician and the third party sign the form, noting that the inmate refused to sign it. V8 at 17.

■■■ Based on the above findings and the expert reports of Defendants' mental health experts (Dr. John G. Martin and Dr. Roderick L. Hall), the Court finds that CM inmates have timely and adequate access to necessary mental health services. Furthermore, CM inmates are receiving treatment that meets or exceeds community standards and comports with basic standards of psychiatric care. V4 at 51–53; V7 at 101–02; DE 25B at 11–12; DE 26 at 20–24, 26. Thus, the access to mental health care that CM inmates enjoy does not violate the Eighth Amendment's prohibition against cruel and unusual punishment. *See* Defendants' Proposed Findings of Fact and Conclusions of Law (Doc. # 841) at 57–58.

**(4) Findings with respect to the alleged lack of qualified mental health staff at CM institutions.**

■■■ There is no required ratio of health care staff to inmates. V6 at 127–28. Instead, there are sufficient health care staff members if the inmates are receiving timely access to care. V6 at 128; V7 at 108. There are an adequate number of mental health staff to meet the psychiatric needs of CM inmates. V7 at 103; DE 25B

at 12; DE 26 at 24–26. Furthermore, the level of staffing provided by the DOC for the care of CM inmates exceeds community standards. DE 26 at 26. The level of mental health staff in CM units comports with constitutional requirements. See Defendants' Proposed Findings of Fact and Conclusions of Law (Doc. # 841) at 62–63.

**(5) Findings with respect to the alleged failure of the mental health staff to take any meaningful steps to address an inmate's mental health needs due to restrictions placed by security staff.**

Security staff are not permitted to interfere with the delivery of mental health services to CM inmates. V8 at 135, 184. Security staff do not have the authority to cancel or postpone a health care appointment of an inmate unless there is a security crisis such as the inmate flooding his cell or threatening to assault someone. V6 at 102; V7 at 170; DE 15.

Security staff are not permitted to bribe inmates to not access mental health services. V8 at 137. Security staff are not allowed to offer extra trays of food in exchange for an inmate not accessing mental health services. V8 at 137. Nevertheless, some inmates sometimes refuse a psychiatric call-out in exchange for an extra tray of food. V5 at 52–60.

Security staff are not present in the room when mental health staff meet with an inmate. V8 at 146. It is not possible for security staff to overhear confidential conversations between mental health care staff and CM inmates when they meet in the rooms that are set aside for mental health call-outs. V3 at 38; V8 at 95–96.

Some inmates reported that some guards try to discourage inmates from attending group therapy by searching their cells and/or destroying their property when they are meeting with mental health staff or by offering the inmates the option of engaging in recreation instead of group therapy. V1 at 82, 85; V2 at 64, Other inmates reported that they decided not to participate in mental health call-outs because they have to be restrained when they leave their cells. V1 at 84–85, 194; V5 at 120. Other inmates reported that officers tell mental health staff who respond to declared psychological emergencies that the inmate is merely a management problem or that the inmate is "playing games." V1 at 169–70; V2 at 245; PE 11 at 28. One inmate reported that a psychologist specialist who ran group therapy was not able to distribute materials about bipolar disorder to inmates because security staff would not permit her to do so. V5 at 99. Another inmate stated that security staff will "run the doctors off the wing and tell them we got something to do." V5 at 229. Another inmate testified ·that he is afraid to declare a psychological emergency because he believes that officers will deprive him of food if he does so. V6 at 18.[17]

On the other hand, Victoria Pence testified that correctional officers would occasionally request that she refer an inmate for care because the inmate appeared to be depressed or crying or the inmate was refusing to eat. PE 299 at 103. Other inmates testified that security staff did not interfere with the delivery of mental health services and some inmates testified that security staff actually encouraged them to participate in mental health call-outs. V1 at 40–41, 105, 193; V2 at 44, 191; V3 at 69, 79, 91, 130; V5 at 15. Many other inmates go to group therapy and do not feel intimi-

---

17. A "drive-by" is prison slang for an officer going by an inmate's cell with the food cart, but failing to deliver a meal to that inmate. V6 at 19. This inmate testified that he has often witnessed "drive-bys" occurring to inmates who have declared a psychological emergency. V6 at 19.

dated by security staff. DE 26 at 22. They endure being shackled and handcuffed because they feel that they are benefitting from group therapy and/or individual sessions. DE 26 at 22.

 The Court finds that there are isolated instances where security staff interfere with the delivery of mental health services. However, the Court finds that any restrictions placed by security staff do not have a significant effect on the ability of mental health staff to take meaningful steps to address CM inmates' mental health needs. Thus, the Court finds that any restrictions placed by security staff that temporarily interfere with or impede the delivery of mental health services do not rise to the level of a federal constitutional violation.

**(6) Findings with respect to the housing of CM inmates in units that are allegedly unsuited for extended confinement.**

Each CM cell is between sixty-four and seventy-eight square feet. V4 at 166. Each cell contains one or two bunks, a toilet, a sink, a bench and a writing surface. V8 at 91, 143, 169, 188; V9 at 8. Two lockers are welded under the bottom bunk. V8 at 91, 169; V9 at 8. CM cells have a window that permits the inmate to look outdoors (there are two windows in the back of the cells at Union CI). V7 at 160; V8 at 91, 143, 169, 188; V9 at 9. The cell doors are solid; however, all CM cell doors also have a window that permits the inmate to see what is happening on the wing. V7 at 160–61; V8 at 91, 143, 169; V9 at 9. The cell door also has a slot near the knee level, through which food trays are passed. V3 at 173; V5 at 12.

The dormitories that house CM inmates have ventilation systems, but are not air conditioned. V2 at 29; V5 at 11, 151; V7 at 161. It is hot in the cells in the summer and sometimes cold in the winter if the heating system is not working properly. V2 at 154–55, 99–100, 195, 214; V3 at 173; V5 at 239. Inmates are permitted to wet their clothing to help them keep cool in the summer and they may wrap themselves in blankets to keep warm in the winter. V2 at 118, 120; V5 at 11–12. There are no showers in the cells, but inmates are able to take a "bird bath" in their sinks and they are usually taken to shower three times per week. V1 at 93; V7 at 155.

CM inmates may not possess a fan, television or other electrical appliances, except a radio. V1 at 31–33, 66; V2 at 154. In some CM cells, correctional officers control the electric lighting. V1 at 32; V5 at 12, 151. Additionally, in some CM cells, inmates are not able to flush the toilet and they must wait for an inmate runner or a correctional officer to flush it for them. V5 at 10–12.

Inmates are permitted to possess some personal property, including stamps, rings, personal correspondence, legal materials, and admissible reading materials, and photographs. V7 at 155–56. They may also possess a radio, paper, a pen and comfort items. V7 at 155. Inmates also receive cleaning supplies to clean their cells once a week. V2 at 162–63.

Inmates in CM have the same cell furnishing as inmates in the general population. V5 at 155. CM inmates also receive the same clothing and bedding that general population inmates receive. V7 at 155. The barber and grooming services for CM inmates and open population inmates are also the same. V5 at 156. CM inmates also receive the same three meals each day that open population inmates receive. V7 at 156.

CM I inmates do not have roommates; however, CM II and CM III inmates are usually housed with two inmates in each cell. V8 at 92, 169. CM II and CM III inmates have roommates to assist them in transitioning back into the open population

by interacting with another inmate. V8 at 170.

At Charlotte CI, there are four quads in each dormitory and twenty-six cells in each quad. V8 at 90. Each quad has one dayroom, which is located in the middle of the quad. V8 at 93. Each quad also has an eight foot by twelve foot room that is used for group therapy, educational courses and religious meetings. V8 at 95. There is a smaller room in each quad that is used for one-on-one interviews or counseling. V8 at 95.

At Santa Rosa CI, CM inmates are housed in six dormitories. V8 at 141. Each dormitory has three wings, with a total of 129 cells. V8 at 142–43. Each wing has a dayroom and two program rooms. V8 at 143. Behind each dormitory is a recreation yard. V8 at 142.

At Lowell CI, there are two CM wings. V8 at 169. There are sixteen cells on the top tier and sixteen cells on the bottom tier of each wing. V8 at 169. There are two rooms for mental health call-outs. V8 at 170. There is one room that is used for group counseling. V8 at 170. There are two dayroom areas. V8 at 170–71.

CM I inmates are the only level of CM inmates housed at Union CI. V8 at 188. Approximately 161 CM I inmates are housed at Union CI. V8 at 188. Two rooms in each dormitory are set aside for CM inmates to meet with mental health staff for individual or group therapy. V8 at 188–89.

There are eleven CM wings at FSP. V9 at 7. Bravo wing has solid floors between each floor, but the rest of the wings have open areas between the floors. V9 at 9. Nine dayrooms and twelve larger rooms are used for group mental health encounters. V9 at 9–10. Multiple offices are also used for individual counseling. V9 at 10. There are numerous outdoor recreation areas. V9 at 10.

 There is simply no credible evidence that CM cells are not suited for extended periods of confinement. Although Plaintiffs' expert in the field of corrections, Chase Riveland, concluded that CM cells were not appropriate for extended periods of confinement due to the extreme heat in the summer and cold temperatures in the winter, *see* V4 at 154–55; PE 11 at 22–23, 28, the Court finds this conclusion to be unfounded. In *Chandler*, the Eleventh Circuit found that the temperatures and ventilation in the death row unit at Union CI "during the summer months are almost always consistent with reasonable levels of comfort and slight discomfort which are to be expected in a residential setting in Florida in a building that is not air-conditioned." *Chandler*, 379 F.3d at 1297 (footnote omitted). The court found that the conditions in those cells did not constitute an extreme deprivation, as required to establish the objective component of an Eighth Amendment violation. Here, too, the record reflects that CM inmates may experience discomfort, but there was no evidence that the conditions in the summer or winter resulted in any extreme deprivations.[18] Thus, the Court finds that CM inmates are housed in units that are adequate for extended periods of confinement and the conditions in these units comport with constitutional requirements.

**(7) Findings with respect to the alleged enforcement of unpromulgated and arbitrary rules prohibiting inmates from talking to each other.**

There are no written rules or regulations that prohibit inmates from speaking

---

18. As noted above, CM inmates can wet their clothing or take a "bird bath" to help alleviate the heat in the summer. Also, inmates may wrap themselves in blankets to be protected from the cold if the heating system does not function properly in the winter.

to each other; however, inmates are not permitted to yell. V3 at 7–9; V7 at 171; V8 at 103, 155, 176, 178, 192; V9 at 21. Inmates are not permitted to yell due to security concerns. V7 at 172. For example, if inmates were permitted to yell, correctional officers would be unable to hear an inmate cry for help if he is being attacked by another inmate or having a heart attack.[19] V7 at 172–73. Inmates are also not permitted to speak to other inmates when they are being transported from their cells to other locations, again due to security concerns. V1 at 87; V8 at 103–04.

An inmate can speak to another inmate in an adjacent cell by speaking through the back window or by speaking through the vent in the cell. V1 at 86, 174; V5 at 60, 174, 190; V8 at 105, 178, 192–93. They can also speak to each other through the door to the cell. V4 at 61; V8 at 178, 192. Although it is not a generally accepted method of communicating, inmates also engage in "fishing," which is a term that inmates use for throwing a note out on a line to an inmate in another cell. V4 at 61; 196–97; PE 11 at 29.

Some inmates testified that they were permitted to speak with their cell-mate, but not to inmates in adjacent cells. V2 at 161, 194; V3 at 7–9, 38, 91, 106. Other inmates testified that it is a violation of the rules to speak with another inmate through the cell doors, windows and vents, see V1 at 46–48, 86, 196; however, inmates are not written up for a disciplinary violation simply for speaking to each other in their cells in a normal tone. V8 at 105, 179, 193; V9 at 22.

One inmate testified that he lost dayroom privileges or gain-time for speaking to another inmate. V2 at 115–6. Another inmate testified that some correctional officers will turn off the ventilation fans or turn off the lights at night, and then tell the inmates that they will not turn the fans or lights back on until the inmates stop talking. V5 at 122. Another inmate reported that he had been denied food or sprayed with chemical agents for talking. V5 at 174.

CM II and CM III inmates are permitted to speak with each other in the dayroom and the exercise yards, as long as they do not speak too loudly. V1 at 89; V2 at 96; V3 at 92, 106, 126; V7 at 161–62; V8 at 104. Some inmates testified that they were not permitted to speak with anyone while engaging in recreation and others testified that they were permitted to speak only to the inmate in the "cage" next to them during recreation. V1 at 86, 177; V3 at 43–44.

■ Although there are occasions when an inmate loses privileges for simply speaking to another innate, the Court finds that these incidents are isolated. In sum, the Court finds that inmates have adequate opportunities to communicate with each other and that any restrictions against yelling or speaking too loudly are constitutional because: such restrictions are reasonably related to legitimate penological concerns; inmates have alternate means to communicate with one another; if inmates are permitted to speak loudly or yell, it would result in "bedlam" and jeopardize security in the CM units; and, there are no ready alternatives to prohibiting yelling or other disruptive behavior. See Overton v. Bazzetta, 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003) (noting that four factors are relevant in deciding whether a prison regulation affecting a

---

19. In their SAC, Plaintiffs acknowledge that "where the 'no talking' rule is not enforced, the noise level can best be described as bedlam." SAC at 22, paragraph 85. Clearly, correctional officers must enforce some restrictions on the level of noise in the CM units to avoid such "bedlam" and to maintain security.

constitutional right withstands constitutional challenge: whether it is reasonably related to a legitimate governmental interest; whether there are alternate means available to inmates to exercise the asserted right; what impact an accommodation of the right would have on guards, inmates and prison resources; and, whether there are "ready alternatives" to the regulation); *Shaw v. Murphy*, 532 U.S. 223, 228, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001) (noting that restrictions on inmate-to-inmate communications pass constitutional muster only if the restrictions are reasonably related to legitimate and neutral governmental objectives).

**(8) Findings with respect to the alleged lack of access to the dayroom and to reading materials, telephones, radios and television.**

Dayrooms have televisions and benches for the inmates to sit on while engaging in recreational pursuits. V8 at 93. While in the dayroom, inmates may watch television, play cards, checkers or other games and use the telephone. V1 at 87, 105, 198; V2 at 35, 52, 113, 151; V8 at 93, 171; V9 at 11. The inmates may also speak with each other while they are in the dayroom. V1 at 89, 105, 175, 198; V8 at 94, 171; V9 at 11.

After the initial thirty-day adjustment period, CM III inmates are supposed to be provided access to a dayroom five days per week for up to four hours each visit. V6 at 212; V7 at 158. CM III inmates are not restrained while they are in the dayroom. V8 at 94. CM II inmates are supposed to be provided access to a dayroom two days per week. V6 at 212. CM II inmates are restrained in the dayroom. V8 at 94, 144. CM I inmates are not eligible for dayroom access. V1 at 48; 87; V2 at 112, 149; V6 at 212; V8 at 114, 143.

Some inmates reported that they were occasionally not permitted to go to the dayroom, either because the officer falsely noted that they had refused to do so or because their uniforms or cells were unsatisfactory. V2 at 162, 195–96, 210. However, most CM II and CM III inmates report that they are usually offered access to the dayroom as set forth above; however, they are not always permitted to stay in the dayroom for the full four hours and they occasionally miss dayroom access due to inadequate staffing to escort the inmates. V1 at 49, 87, 105–07, 198; V2 at 32, 35, 52, 113, 123, 149–50; V5 at 75–77, 93, 97; PE 11 at 7.

Dr. Linn's statistical analysis demonstrates that DOC officials are complying with the dayroom requirements for CM II and CM III inmates ninety-three percent of the time at Florida State Prison, ninety-five percent of the time at Santa Rosa CI and Union CI, and ninety-seven percent of the time at Charlotte CI and Lowell CI. DE 24; V6 at 218–221.

All CM inmates are permitted to have reading materials that are admissible under the DOC's rules, including religious scripture and devotional materials. V7 at 156. They are also permitted to subscribe to a magazine and/or a newspaper and to have four issues of each publication in their possession at any given time. V2 at 157; V7 at 156; V8 at 115, 175; V9 at 16. They may also possess educational, mental health, wellness, legal and religious reading materials. V7 at 156; V8 at 115; V9 at 16. Additionally, all CM inmates may order books from the library. V1 at 198; V2 at 156; DE 27 at 9. One inmate testified that he had been denied access to reading materials on several occasions when he was not dressed correctly or the officer was in a bad mood. V2 at 211. However, the vast majority of the inmates report that they are generally permitted to have authorized reading materials and read in their cells, unless they are in disci-

plinary confinement. V1 at 33, 163; V2 at 30, 229, 240; V3 at 65, 138; V5 at 11; PE 11 at 5.

CM inmates may make emergency telephone calls and calls to their attorneys as necessary. DE 27 at 9. Additionally, after the initial thirty days in CM, CM I inmates may make one, fifteen-minute telephone call every thirty days. V1 at 89–90; V2 at 155; V6 at 37; V7 at 157–58; V8 at 115. CM II inmates are permitted to make one telephone call every fourteen days. V1 at 89–90; V2 at 155–56; V7 at 158; V8 at 115. CM III inmates are permitted to make one telephone call every week. V2 at 115; V7 at 158; V8 at 115. Inmates report that they are generally permitted to make these telephone calls, unless they are in disciplinary confinement. V2 at 122; PE 11 at 6.

All CM inmates are permitted to purchase a radio and headphones. V7 at 155; V8 at 115, 154, 176, 192; V9 at 16. Inmates report that they are allowed to purchase radios; however, if they are indigent, they are unable to purchase a radio or batteries for their radios. V1 at 33, 66, 164; V2 at 30, 208, 212, 239; V3 at 65, 138; PE 11 at 6.

█ Based upon the above findings, the Court finds that CM inmates are given adequate access to the dayroom and to reading materials, telephones, radios and television. Furthermore, any failure to provide the exact amount of access to these privileges that is set forth in the ROJ does not amount to an Eighth Amendment violation. *See* Defendants' Proposed Findings of Fact and Conclusions of Law (Doc. # 841) at 55.

### (9) Findings with respect to the alleged lack of opportunity to exercise.

Many inmates testified that they exercise in their cells. V1 at 33, 165; V2 at 30, 208; V8 at 192. Additionally, after an initial thirty-day adjustment period, CM inmates are supposed to receive two hours of outdoor exercise, three days per week. V6 at 211–12; V7 at 157; V8 at 114, 191; DE 15.

The outdoor recreation area is like a large "cage," with a concrete floor enclosed by chain link fencing. V1 at 50–51; DE 27 at 10. The dimensions of each outdoor recreation area is approximately ten feet by twenty feet by twelve feet. DE 27 at 10. Most of these recreational areas contain a pull-up bar and a dip bar. V1 at 51, 176; V2 at 96, 122, 149; V3 at 40. Some CM III inmates are permitted to go to a gymnasium three times per week, where they jump rope and jog or play basketball, volleyball, soccer and handball. V5 at 131.

Some inmates testified that they were occasionally denied recreation because the officer ignored their requests for recreation or their rooms or uniforms were unsatisfactory.[20] V1 at 50; V2 at 95–96, 196, 204; V3 at 107; V5 at 122, 124, 157. Inmates report that they are generally offered recreation three times per week, but some inmates refuse to go for various reasons and others reported that they were not permitted to stay in the recreation yard for the full two hours. V1 at 90–91, 176, 199; V2 at 32, 52–53, 67, 76, 149, 158; V3 at 41, 65–66; V4 at 199, 201–02; V5 at 78, 124, 187–88, 218, 237; V6 at 22–23; PE 11 at 7.

Dr. Linn's statistical analysis demonstrates that DOC officials are complying with the exercise requirements for CM

---

20. In order to be permitted to go to the recreational yard, an inmate must make sure his bed is made, that all his possessions are in his locker, and that he is dressed in a pair of boxer shorts, with his clothes and shoes in his hands. V2 at 76–77, 120.

inmates eighty-one percent of the time at Florida State Prison, ninety-four to ninety-five percent of the time at Charlotte CI, ninety-five percent of the time at Union CI, ninety-eight percent of the time at Santa Rosa CI and ninety-nine percent of the time at Lowell CI. DE 24; V6 at 218–221.

■ Based upon the above-findings, the Court finds that CM inmates are provided with adequate opportunities to exercise. Any occasional failure to provide outdoor recreation in accordance with the terms of the ROJ is not the sort of extreme deprivation that would rise to the level of an Eighth Amendment violation.

(10) **Findings with respect to the alleged inability of many CM inmates to take advantage of educational opportunities, make canteen purchases or engage in visitation.**

The DOC employs seventeen full-time certified academic teachers at the CM institutions (six at Santa Rosa CI, six at Charlotte CI, seven at Florida State Prison, one at Lowell CI and three at Union CI). V8 at 53, 55. CM II and CM III inmates are brought out of their cells to rooms for studying and lectures. V8 at 48. All CM I inmates are authorized to receive cell-front tutoring, wellness puzzles, wellness education courses and in-cell exercise guides. V7 at 157; V8 at 154; V9 at 15. CM I inmates are provided with educational material and then someone comes by the cell to discuss the inmate's educational progress and to answer any questions the inmate may have. V2 at 78; V8 at 48. Although CM I inmates are usually provided cell-front instruction, CM I inmates are occasionally removed from their cells for educational activities, such as GED studies. V2 at 78; V8 at 48, 153.

Adult education is available to inmates in CM, as well as GED education[21] and basic literacy education. V1 at 53, 111–12, 202–03; V2 at 33–34, 124, 156, 212–13; V3 at 39, 108, 122; V5 at 219; V8 at 47. The DOC also provides educational opportunities for CM inmates who have been identified as requiring special education. V8 at 47, CM III inmates may also participate in group education and self-help programs. V7 at 158.

The DOC provides a program called "Rethinking Personal Choices," which is designed to prepare CM inmates for reentry into the open population and to teach them to function effectively without harming others while in an open population status. V3 at 106; V5 at 131; V8 at 49–50. This course is also open to CM inmates who are going to be released from CM back into the community. V8 at 51.

One inmate reported that he has never been offered any educational opportunities while in the custody of the DOC. V1 at 186. Another inmate testified that he had no opportunity to engage in vocational training on CM I. V2 at 32. Another inmate stated that there are no educational programs for CM I inmates. V2 at 240. However, most inmates testified that they had access to educational programs, unless they were in disciplinary confinement.

All CM inmates are permitted to make purchases from the canteen after they have had thirty days of good behavior. V7 at 156. CM III inmates are permitted to purchase five non-food items and ten food items from the canteen. V7 at 159. All levels of CM are permitted to make canteen purchases weekly. V8 at 115, 176. Inmates report that they are permitted to make purchases as set forth above. V2 at 98; PE 11 at 7.

---

21. In fact, seventy-two CM inmates received their GED in the fiscal year preceding the hearing in this case. V8 at 47.

All CM inmates are permitted to engage in visitation. V7 at 157; V9 at 19. CM I inmates are limited to one, non-contact visit for approximately two hours every thirty days. V7 at 157; V8 at 113, 174, 191. CM II inmates are permitted two, non-contact visits for approximately two hours every fourteen days. V7 at 157. CM III inmates may have contact visits every fourteen days. V7 at 159. Visitation occurs in the visiting park. V8 at 118; V9 at 19. The CM I and CM II inmates' non-contact visitation occurs in a secure cell in the visiting park. V8 at 118, CM III inmates visit with the open population inmates so that staff are able to evaluate their ability to integrate back into the open population. V8 at 118. Inmates report that they are generally permitted to engage in visitation as set forth above; however, they may not do so because of other factors (for example/ family members live too far away or the inmate does not desire to be seen by visitors because he is in restraints). V4 at 159; PE 11 at 7, 29.

██ Based upon the above findings, the Court finds that CM inmates have adequate access to educational opportunities, and have adequate opportunities to make canteen purchases and engage in visitation. Furthermore, any failure to provide the exact amount of access to these privileges that is set forth in the ROJ does not amount to an Eighth Amendment violation. *See* Defendants' Proposed Findings of Fact and Conclusions of Law (Doc. # 841) at 55.

### D. Termination of the Injunction

The Court previously found that the injunction in this case is subject to termination pursuant to the PLRA; however, as stated previously, the PLRA also provides that:

> Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

18 U.S.C. § 3626(b)(3).

██ It is clear "that Congress intended 'current and ongoing' to mean a presently existing violation, not a potential/ or even likely, future violation." *Cason v. Seckinger*, 231 F.3d 777, 783 (11th Cir. 2000). Thus, the Eleventh Circuit has held that "a 'current and ongoing' violation is a violation that exists at the time the district court conducts the § 3626(b)(3) inquiry, and not a potential future violation." *Id.* at 784. As noted above. Plaintiffs have the burden of proving current and ongoing constitutional violation(s). *Id.* at 782–83.

In this case, the Court has limited its inquiry to whether the conditions in CM are unduly harsh and punitive, in violation of Eighth Amendment, due to the combined long-term effect of the ten factors set forth above. With regard to those factors, this Court has found that: (1) CM staff receive adequate training regarding the mental health needs of CM, but some officers occasionally fail to adhere to that training; (2) the DOC provides adequate mental health screening of CM inmates; (3) the DOC ensures that CM inmates have timely access to necessary mental health services; (4) there are sufficient qualified mental health staff at CM institutions; (5) mental health staff are able to take meaningful steps to address an inmate's mental health needs despite any restrictions placed by security staff; (6) CM inmates are housed in units that are suited for extended confinement; (7) although there are occasions when an inmate loses privileges for simply speaking to an-

other inmate, these incidents are isolated, and CM inmates have adequate opportunities to communicate with each other; (8) CM inmates have adequate access to the day-room and to reading materials, telephones, radios and television; (9) CM inmates have adequate opportunities to exercise; and, (10) CM inmates have adequate access to educational opportunities, and have adequate opportunities to make canteen purchases and engage in visitation.

The Court has found that Plaintiffs proved only one constitutional violation with respect to the ten relevant factors identified by the Court (the occasional failure of CM staff to adhere to their training by failing to appropriately respond to a *bona fide* psychological emergency).[22] Accordingly, the Court will now inquire whether any of the injunctive relief contained in the ROJ must not be terminated because the relief remains necessary to correct the above-identified constitutional violation.

 As an initial matter, the Court finds that these isolated instances, which occurred to relatively few members of the class, are insufficient to demonstrate that there are current and ongoing violations of the class members' constitutional rights. As noted by the Defendants, to obtain system-wide relief, the Plaintiffs must show system-wide injury. *See* Defendants' Proposed Findings of Fact and Conclusions of Law (Doc. # 841) at 66–67. Proof of isolated injuries that are not the result of a systemic defect does not support system-wide relief. *Lewis v. Casey*, 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("the success of respondents' systemic challenge was dependent on their ability to show widespread actual injury, and [the District Court's] failure to identify anything more than isolated instances of actual injury renders its finding of a systemic . . . violation invalid.").

However, even assuming *arguendo* that there are sufficient instances of a failure to respond appropriately to a *bona fide* psychological emergency to show a "continuing and ongoing" violation of the class members' Eighth Amendment rights, the Court finds that none of the provisions of ROJ, if enforced, would remedy such violations. An explanation follows.

As noted previously, the injunctive relief set forth in the ROJ was intended to minimize the potentially harmful effects of CM by: (1) reducing the number of institutions that house CM inmates from ten institutions to four institutions (one for females at Dade Correctional Institution and three for males at Florida State Prison, Santa Rosa Correctional Institution and Charlotte Correctional Institution); (2) conducting staff training on mental health issues relevant to the CM population; (3) performing mental health screening before and after placement in CM to help ensure timely access to necessary mental health services; (4) assessing behavioral risk for each CM inmate, in order to provide more objective information to be used for mental health and other service planning and administrative decision-making; (5) providing a full range of outpatient mental health services (for example, group and individual

---

22. Thus, the Court need not address whether the combined effect of the ten alleged deficiencies results in an Eighth Amendment violation since the Court has found the Plaintiffs have only proven a portion of the first alleged deficiency. Nevertheless, the Court notes that there was some evidence presented at the hearing that a few CM inmates experienced some mental deterioration; however, it is not clear what caused this deterioration (it is noteworthy that many of these inmates were in the much more restrictive disciplinary confinement during the relevant time periods). There was simply no credible evidence that the current conditions in CM confinement, by themselves, cause mental deterioration in CM inmates.

counseling, case management, psychiatric consultation, psychotropic medications and timely referral to inpatient care) that are commensurate with clinical need, as determined by the DOC's mental health staff; and, (6) providing self-betterment/stimulation programming to CM inmates. Plaintiffs concede that the injunctive relief contained in the first and fourth categories is due to be terminated.[23] Accordingly, the injunctive relief contained in the first and fourth categories of the ROJ will be terminated, and the Court will not address these two categories further.

Thus, the Court will now address the remaining provisions of the ROJ to determine whether enforcement of these provisions remains necessary to correct the potential current and ongoing violation identified by the Court. The Eleventh Circuit has stated that if a district court finds that a current and ongoing violation exits, the court must make written findings on the record about "whether the prospective relief **aimed at that violation** remains necessary to correct it." *Cason*, 231 F.3d at 784 (emphasis added).

The only injunctive relief in the ROJ that is aimed at correcting CM officers' inappropriate responses to CM inmates' mental health needs is entitled, "Staff Training," and states the following: "All security, classification, and program staff assigned to the four designated CM institutions shall receive training on suicide prevention (2 hours) and other mental health issues of relevance to care of CM inmates (3 hours), within 60 days after assignment and annually thereafter." ROJ at 6. The Court has found that, in accordance with this provision of the ROJ, the DOC provides these two courses to train DOC staff on mental health issues with CM inmates, and provides refresher training annually. Ordering the DOC to continue giving this training would be fruitless since CM staff have been receiving the training, but sometimes choose to ignore it. Clearly, further enforcement of this portion of the ROJ would not stop some officers from occasionally choosing to ignore the training they receive. Thus, this portion of the ROJ is due to be terminated because it does not correct the potential current and ongoing violation identified by the Court.

The remaining injunctive relief in the ROJ (contained in the portions of the ROJ entitled, "Mental Health Screening," ROJ at 6–9; "Mental Health Treatment," ROJ at 10–11; and, "Self Betterment/Stimulation Programming for CM Inmates," ROJ at 12–15) is not aimed at correcting CM officers' inappropriate responses to CM inmates' mental health emergencies. In any event, the Court has found that the DOC has been in substantial compliance with the injunctive relief set forth in these three sections of the ROJ. Clearly, further enforcement of these three sections of the ROJ would not stop some officers from occasionally responding inappropriately to CM inmates' mental health emergencies. Thus, these portions of the ROJ are due to be terminated because they do not correct

---

**23.** With respect to the first category of injunctive relief in the ROJ, Plaintiffs concede that the failure of the DOC to reduce the number of institutions that house CM inmates from ten institutions to four institutions (one for females at Dade Correctional Institution and three for males at Florida State Prison, Santa Rosa Correctional Institution and Charlotte Correctional Institution) does not result in a federal constitutional violation and, therefore,

this provision of the ROJ is due to be terminated. *See* Plaintiffs' Proposed Findings of Fact, Conclusions of Law, and Order (Doc. # 842) at 96–97. Additionally, with respect to the fourth category of injunctive relief in the ROJ, Plaintiffs concede that the injunctive relief pertaining to the assessment of behavioral risk for each CM inmate is due to be terminated. *See id.* at 98.

the potential current and ongoing violation identified by the Court.

Accordingly, for all of the above-stated reasons, the Court will terminate the injunctive relief contained in the ROJ. However, the Court would like to note that the testimony and other evidence presented at the evidentiary hearing on this matter has demonstrated that the conditions in CM have dramatically improved[24] since the implementation of the ROJ. Although the Court cannot order the DOC to keep the "Staff Training," "Mental Health Screening," "Mental Health Treatment," and "Self Betterment/ Stimulation Programming for CM Inmates," provisions of the ROJ in place, the Court strongly encourages the DOC to do so. These provisions have clearly improved the general conditions in CM and the access to mental health services for CM inmates.

### E. Additional Injunctive Relief

The Plaintiffs urge the Court to grant additional injunctive relief to correct any current and ongoing violations. *See* Plaintiffs' Proposed Findings of Fact, Conclusions of Law, and Order (Doc. # 842) at 100–02. The Court declines to do so. As noted previously, to obtain system-wide relief, the Plaintiffs must show system-wide injury. The isolated violations identified by the Court above are not the result of a systemic defect and do not support system-wide relief.

### IV. Conclusion

Therefore, for all of the above-stated reasons, the Court will terminate the injunctive relief contained in the Order Entering Defendants' Revised Offer of Judgment (Doc. # 383) and close this case.

Accordingly, it is now

**ORDERED:**

1. Defendants' Motion to Terminate Revised Offer of Judgment (Doc. # 681) is **GRANTED.** The injunctive relief contained in the Order Entering Defendants' Revised Offer of Judgment (Doc. # 383) is hereby **TERMINATED** in accordance with the Prison Litigation Reform Act.

2. The Clerk of the Court shall close this case.

---

**24.** For example, before the implementation of the ROJ, CM inmates could not watch television, could not possess a radio, were limited to three hours of outdoor recreation per week, were limited to three showers per week, were not permitted to visit the law library or the regular library, were not permitted to attend religious services or otherwise participate in group activities, and were not permitted to make any telephone calls other than emergency calls or calls to an attorney. See Plaintiffs' Proposed Findings of Fact, Conclusions of Law, and Order (Doc. # 842) at 11.